_____

No. 94-3902
_____

Alan Jeffrey Bannister,                *
                                       *
          Appellant,                   *
                                       *
     v.                                *  Appeal from the United States
                                       *  District Court for the
Paul K. Delo,                          *  Western District of Missouri.
                                       *
          Appellee.                    *
                                       *
----------------------------           *
Lyon (France) Bar Association          *
Commission, for the Defense of         *
the Human Rights; Lawyer's             *
(Sweden) Association for the           *
Defence of Human Rights;               *
International Centre of                 *
Criminal Law & Human Rights;           *
Maastricht Centre for Human            *
Rights of the Faculty of Law           *
of the University of Maastricht,*
                                       *
          Amici Curiae                 *
          on Behalf of                 *
          Appellant.                   *


_____

Submitted:  November 15, 1995

   Filed:  November 14, 1996
_____

Before WOLLMAN, BRIGHT and HENLEY, Circuit Judges.*

_____

HENLEY, Circuit Judge.




_____

     *Circuit Judges Bright and Henley are Circuit Judges on
     senior status.

Alan J. Bannister, a Missouri death-row inmate, appeals from a judgment of the district court[1] dismissing a successive petition for a writ of habeas corpus filed pursuant to 28 U.S.C § 2254. We affirm.[2]

## I. Background

In 1983 a jury convicted Bannister of the capital murder of Darrell Reustman and he was sentenced to death. His conviction and sentence were affirmed on direct appeal, State v. Bannister, 680 S.W.2d 141 (Mo. 1984) (en banc), cert. denied, 471 U.S. 1009 (1985). His motions for state post-conviction relief were denied, e.g., Bannister v. State, 726 S.W.2d 821 (Mo. Ct. App.), cert. denied, 483 U.S. 1010 (1987), as was a section 2254 petition for a writ of habeas corpus, Bannister v. Armontrout, 807 F. Supp. 516 (W.D. Mo. 1991). We affirmed the denial of habeas relief. Bannister v. Delo, 4 F.3d 1434 (8th Cir. 1993), cert. denied, 115 S. Ct. 418 (1994) (Bannister I).

Bannister thereafter filed a subsequent petition. The district court dismissed that petition, holding that the claims in it were either successive or abusive and Bannister had not demonstrated cause and prejudice under Wainwright v. Sykes, 433 U.S. 72 (1977), or produced clear and convincing evidence of his actual innocence under Sawyer v. Whitley, 505 U.S. 333 (1992), so

---

[1]The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

[2]After oral argument in this case, on April 24, 1996, President Clinton signed the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, "which works substantial [and restrictive] changes to" section 2254. Felker v. Turpin, 116 S. Ct. 2333, 2335 (1996). Because we hold that Bannister is not entitled to relief under the prior more lenient habeas law, we do not address the state's contention that the Act is applicable to this appeal and precludes relief.

as to permit habeas review.[3]  Bannister v. Delo, No. 94-1141-CV-W-9 (W.D. Mo. Dec. 5, 1994) (order).  While  Bannister's appeal was pending, the Supreme Court decided Schlup v. Delo, 115 S. Ct. 851 (1995).  In Schlup, as to guilt-phase actual innocence claims, the Court rejected the "clear and convincing" Sawyer standard and adopted the more lenient "more likely than not" standard of Murray v. Carrier, 477 U.S. 478, 496 (1986).  Id. at 867.  On the state's motion, we remanded the case to the district court "for consideration of appellant's guilt-phase claims in light of Schlup v. Delo, and for reconsideration of such other of the District Court's previous rulings challenged by appellant's appeal, as the District Court determines is necessary and proper." (citation omitted).  We noted that the "District Court may take additional evidence and conduct such evidentiary hearings as it deems necessary."

On remand, Bannister filed a motion to disqualify Judge Bartlett under 28 U.S.C. §§ 144 and 455(a), alleging that the judge was biased against successive habeas petitions.  Judge Bartlett denied the motion.  The judge also denied Bannister's request for an evidentiary hearing to establish cause and prejudice or actual innocence and, reaffirming much of its previous order, dismissed his petition.  Bannister v. Delo, 904 F. Supp. 998 (W.D. Mo. 1995).  This appeal follows.

## II.  Disqualification

Before addressing Bannister's arguments concerning the district court's dismissal of the habeas petition, as an initial matter we address his contention that the court erred in denying his motion for disqualification under 28 U.S.C. §§ 144 and 455(a).
Section 144 provides that "whenever a party . . . files a timely

---

[3]Bannister filed the instant petition shortly before a scheduled execution date.  This court entered a stay of execution, which was upheld by the Supreme Court.

-3-

and sufficient affidavit that the judge before whom the matter is pending has a personal bias against him or in favor of any adverse party, such judge shall proceed no further . . . ."  Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned."

In support of the disqualification motion, Bannister filed an affidavit in which he stated that he had learned that Judge Bartlett had recused himself from ruling on a successive habeas petition of another death-row inmate, Doyle Williams, and that the judge's comments at the recusal hearing demonstrated he was biased against successive habeas petitions.  At the hearing, Judge Bartlett stated:

> I am persuaded that I cannot be fair.  As I told counsel, I worked very hard on the first round of this habeas, believing that I had done what I could do to bring into one lawsuit the federal claims, and believing that was consistent with the rational, fair criminal justice system.
>
> I now find that we are embarked on another round of litigation which promises to be more time-consuming than the first.  I do not think that's consistent with a rational criminal justice system.  I don't think it's consistent with any principles that the Supreme Court has enunciated should govern this litigation.
>
> ***
>
> I have concluded that in this case it is not personal views about the merits of the argument being raised, it is not my personal views about the state's right to determine to decide what penalty will be assessed for certain crimes, . . . .  I have a strong and abiding faith in the rational system.  My personal belief is causing impatience in the belief that this proceeding has gone beyond the limits of rationality.  And it is, I am afraid of coloring my views on resolving the issues.

Trancript of Recusal Proceedings in Williams v. Delo, No. 91-0230-CV-W-9, in Bannister's Supplemental Appendix at 3.  Judge Bartlett denied Bannister's motion to disqualify, explaining his

"frustrations" in the Williams case "were related solely to my work on th[at] case."  Order of April 13, 1995 at 2.

"In this circuit, whether disqualification is required in a particular case is committed to the sound discretion of the  district judge, and we review only for an abuse of discretion." In re Kansas Pub. Employees Retirement Sys., 85 F.3d 1353, 1358 (8th Cir. 1996) (In re KPERS).  "This is so because '[t]he judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion.'"  Id. (quoting In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir. 1988), cert denied, 490 U.S. 1102 (1989)). "Accordingly, we presume Judge Bartlett is impartial, and [Bannister] bears 'the substantial burden of proving otherwise.'"  Id. (quoting Pope v. Federal Express Corp., 974 F.2d 982, 985 (8th Cir. 1992)).

Moreover, we must keep in mind that in Liteky v. United States, 510 U.S. 540, 55O (1994), the Supreme Court made clear that "[n]ot all unfavorable disposition towards an individual (or his case) is properly described by th[e] terms" bias or prejudice.  Rather, "[t]he words connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . ., or because it is excessive in degree . . . ."  Id.  Thus, bias can be shown if a judge's remarks or opinions "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  Id. at 555.  However, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  Id.  Also "[n]ot establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display."  Id. at 555-56.

On appeal, Bannister does not argue that Judge Bartlett demonstrated actual bias, but argues he should have disqualified himself under section 455(a) because his comments at the <u>Williams</u> recusal hearing created an appearance of bias against successive habeas petitions. "Under § 445(a), we consider whether the judge's impartiality might reasonably be questioned by the average person on the street who knew all the relevant facts of a case." <u>In re KPERS</u>, 85 F.3d at 1358. We agree with the state that a reasonable person who knew all the circumstances--including the reasons why Judge Bartlett recused himself in the <u>Williams</u> case--would not question the judge's impartiality in this case.

Following the above-quoted comments, Judge Bartlett explained that he was recusing himself because he had become frustrated with the manner in which the <u>Williams</u> case had been proceeding. The judge noted that he had expressed frustration with the case the previous week during a telephone conference, which had been convened because in papers filed shortly before a scheduled evidentiary hearing, Williams appeared to be waiving the hearing. During the conference, Judge Bartlett expressed his frustration not only at Williams' apparent change in tactics, but also at the timing and the length of the papers. Judge Bartlett told Williams' counsel, "it looks to me like, you're trying to figure out how to drown everybody in paper and make this thing absolutely as complex, drawn out and as difficult as possible." Supp. App. at 29. The judge further told counsel, "what happens next week I don't know frankly. . . . [I]f there's this much stuff that has been raised I need to look at it over the weekend and Monday I'll be informed and we'll sit down and decide what to be doing." <u>Id.</u> at 34.

On Monday the judge recused himself. He explained that over the weekend he had struggled to distinguish between what he believed was appropriate institutional impatience with successive habeas petitions and inappropriate personal impatience with a particular case, and believed recusal was appropriate because

"there [wa]s a possibility that the appropriate institutional impatience ha[d] crossed over and will inappropriately affect my approach to the issues in this case."  Id. at 47.   The judge emphasized that his "impatience was a development for this case only."  Id. at 51.

In context, it is clear that Judge Bartlett recused himself in Williams because of his frustration with the course of that litigation, and not because of any "wrongful or inappropriate" disposition as to successive petitions.  Litkey, 510 U.S. at 550.   His remarks during the Williams proceedings about successive habeas petitions are "not subject to characterization as bias or prejudice."  In re Larson, 43 F.3d 410, 413 (8th Cir. 1994).   They are not so excessive in degree "as to make fair judgment impossible."  Liteky, 510 U.S. at 555.   Indeed, during the Williams case, Judge Bartlett did exactly what Liteky demands.  We thus hold that the district court did not abuse its discretion in denying Bannister's motion for disqualification.

## III.  Guilt Phase Claims

As previously noted, in 1983 a jury convicted Bannister of the August 21, 1982 capital murder of Darrell Reustman in Joplin, Missouri.   The state's evidence included an August 23, 1982 statement in which Bannister gave "an account of the crime from its inception to [his] arrest" in the early morning hours of August 22, 1982 at a bus station.   State v. Bannister, 680 S.W.2d at 147.   In brief, the evidence established that in 1982, while Bannister was living in Peoria, Illinois, he agreed to be the "hit" man in a contract killing of Reustman, which had been arranged by Rick "Indian" Wooten for Richard McCormick, who wanted Reustman killed because he was living with McCormick's wife, Linda McCormick.

## A.  Actual Innocence

We first address Bannister's arguments concerning his Schlup v. Delo guilt-phase actual innocence claim.   "This narrow exception

in the procedural bar analysis is concerned with actual as compared to legal innocence." Jolly v. Gammon, 28 F.3d 51, 54 (8th Cir.), cert. denied, 115 S. Ct. 462 (1994) (internal quotation omitted). In Schlup, the Supreme Court explained that the petitioner's "'claim of innocence is [] not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" 115 S. Ct. at 861 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). To satisfy Schlup, a petitioner must first "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Id. at 865. The petitioner must then demonstrate that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 867.

Although at trial Bannister presented a reasonable doubt defense and suggested that Linda McCormick had murdered Reustman, Bannister now admits that he shot and killed Reustman. He, however, asserts that he is actually innocent of capital murder because he did not intend to shoot Reustman. According to Bannister's present theory of the case, the shooting occurred accidently during a struggle after Bannister confronted Reustman in a mistaken belief that Reustman was responsible for a stabbing Bannister had received in Arizona. Bannister claims that although he initially believed that Wooten was responsible for the stabbing because he had owed Wooten money for a drug deal, Wooten had convinced him that Reustman was responsible for the stabbing and, giving him a gun, money for a bus ticket, and a piece of paper with Reustman's name and address, enabled Bannister to travel to Joplin to confront Reustman. Bannister asserts that he did not intend to kill Reustman, but only wanted to "make him feel some of the pain that I felt." Opening Br. at 7. He argues that although he may be guilty of second-degree murder or manslaughter, he is innocent of

-8-

capital murder, which under Missouri law requires an element of premeditation.[4]  See Mo. Rev. Stat. § 565.001 (1978).

In support of his claim, Bannister submitted the affidavits of Wooten, Beverly Taylor, an investigator who had interviewed Wooten, and Steven Trombley, a film maker who wrote a biography of Bannister and directed a documentary film entitled "Rasing Hell: Stories of A. J. Bannister."

In his November 22, 1994 affidavit, Wooten, who was incarcerated for murder, states that he "had no contact with any of the persons allegedly involved" with Reustman's murder, but knew "for a fact this murder was not a murder for hire."  In her November 28, 1994 affidavit, Taylor states that

---

[4]For purposes of this appeal, we assume, but do not decide, that Bannister has at least alleged an actual innocence claim. Although Bannister does not raise a "prototypical" claim of actual innocence, in Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1995), cert. denied, 116 S. Ct. 1330 (1996), we explained that even though a petitioner was "responsible for the victim's death in the sense that he was the causative agent that inflicted the mortal wounds," he had alleged actual innocence where he claimed that new evidence showed that he was incapable of forming "the predicate deliberative intent, without which he could not have been found guilty of capital murder."  We reasoned that "negation of an element of the offense accord[ed] with the strictest definition of actual innocence."  Id. (internal quotation omitted).
     In this case, Bannister does not allege that he was incapable of possessing the requisite intent, as did petitioner in Jones, but only alleges that he did not possess the intent.  In Pitts v. Norris, 85 F.3d 348, 350 (8th Cir.), cert. denied, 1996 WL 557496 (U.S. Nov. 4, 1996) (No. 96-6084), petitioner, who had been convicted of capital felony murder arising from a kidnapping, raised an argument somewhat similar to the one Bannister now raises.  In Pitts, the petitioner conceded that he had murdered his kidnap victim, but argued that he was innocent of capital felony murder because he intended to murder the victim from the beginning and thus lacked an independent intent to commit the underlying kidnapping, as the state statute required.  We held that his argument was as one of legal not factual innocence and observed that even if petitioner were "right, convicting him is not a fundamental miscarriage of justice by any stretch of the imagination."  Id. at 351.

Wooten told her he

was not involved in Reustman's murder, claiming he "would never have had an amateur perform a 'hit'" and that Bannister was not "the kind of boy to get involved in a violent crime such as murder."

In his November 7, 1994 affidavit, Trombley states that based on his two-year investigation of Reustman's killing, he concluded that "while Bannister did shoot and kill Darrell Reustman, the complete story is that Richard McCormick hired Indian to kill" Reustman, but that because Indian wanted to "pocket" the "hit" money, he "provid[ed] Bannister with a motive for the crime," by "duping" Bannister into believing that Reustman was responsible for the Arizona stabbing.  Affidavit at Paragraphs 29 and 35.

The district court held that the affidavits did not come close to meeting the Schlup actual innocence standard and thus did not warrant an evidentiary hearing.  See Barrington v. Norris, 49 F.3d 440, 442 (8th Cir. 1995) (per curiam) (petitioner did not make "a sufficient showing of actual innocence to warrant a hearing on the issue").  The district court found that Taylor's affidavit merely summarized Wooten's claims and that Wooten's affidavit was not only internally inconsistent, "conclusory, incredible, and unpersuasive," but also conflicted with Trombley's affidavit.  904 F. Supp. at 1004.  As to Trombley's affidavit, the court found that essentially it was based on unreliable hearsay and "hopeful speculation to come up with a theory about how the killing happened."  Id.

On appeal Bannister argues that the district court erred in failing to hold an evidentiary hearing, asserting that the court could not assess credibility on the basis of the affidavits.  We disagree.  In Battle v. Delo, 64 F.3d 347, 352 (8th Cir. 1995), cert. denied, 116 S. Ct. 1881 (1996), we recognized that "[if] new evidence calls the credibility of certain witnesses into question, and their credibility figures reasonably in our assessment, remand

-11-

for an evidentiary hearing may be appropriate.  However, the mere fact that affidavits are presented does not automatically require such a remand." Id. (footnote omitted).  Indeed, in Schlup, the Court held that in determining whether an evidentiary hearing is necessary, a district court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial."  115 S. Ct. at 869.  In making this assessment, the district court "may consider how the timing of the submission and the likely credibility of the affiants bear on the reliability of that evidence."  Id.

Bannister also incorrectly asserts that an evidentiary hearing was required so that he could develop evidence in support of his claim of actual innocence.  In Battle, 64 F.3d at 353, we rejected the argument that an evidentiary hearing was necessary to enable the petitioner to develop evidence "which, he claim[ed], w[ould] exonerate him."  Noting that "[i]n essence, [petitioner] [wa]s asking us to excuse his evidentiary default as to his claim of actual innocence, . . . in order that he may develop sufficient evidence of his actual innocence[,]" we found "[t]his circular argument [wa]s without merit."  Id. at 354.  We explained:

> a remand is inappropriate because the actual innocence gateway through a procedural bar is not intended to provide a petitioner with a new trial, with all the attendant development of evidence, in hopes of a different result.  Rather, it is an opportunity for a petitioner, aggrieved by an allegedly defective trial and having inexcusably defaulted the available remedies, to raise such a strong doubt to his guilt that, in hindsight, we cannot have confidence in the trial's outcome unless it was indeed free of harmless error.  To avail himself of that opportunity, it is the petitioner's, not the court's, burden to support his allegations of actual innocence by presenting new reliable evidence of his innocence.

Id. (internal citations and quotation omitted).  Moreover, before an evidentiary hearing in federal court is required a petitioner

-12-

"must allege facts which, if proved, would entitle him to relief[.]" Bowman v. Gammon, 85 F.3d 1339, 1343 (8th Cir. 1996) (internal quotation omitted).  Thus, an evidentiary hearing is not required on a claim of actual innocence if development of the claim would not establish actual innocence.  Id.

In this case, it is clear that the district court did not err in failing to conduct an evidentiary hearing.  On appeal, Bannister apparently no longer relies on Wooten's and Taylor's affidavits, but argues that Trombley's affidavit satisfies the Schlup standard and that the district court improperly discredited Trombley because of his alleged commercial interest in the case.  Although the district court believed that Trombley tended to exaggerate because of his commercial interest in Bannister's life, the district court correctly concluded--credibility issues aside--Trombley's affidavit was not evidence of actual innocence.  See Battle, 64 F.3d at 352 (evidentiary hearing unnecessary because even crediting affiants they did not establish actual innocence).[5]  Although in his affidavit Trombley set forth Bannister's allegations that he travelled to Joplin only "to carve [his] initials on [Reustman's] ass" and that the shooting was accidental, Affidavit at Paragraphs 29-30, it is clear that Trombley does not believe Bannister.  Trombley's theory is that Wooten "devised a way to keep all of the

_____

[5]In an attempt to bolster Trombley's credibility, in this appeal Bannister presents a second affidavit by Trombley, which was not submitted to the district court.  In the affidavit, Trombley disputes the district court's belief that his commercial interest in Bannister influenced his views, contending that he would make more money on a commercial venture about Bannister if he were executed.  The state has filed a motion to strike the affidavit and an attached exhibit.  "In the interest of full information, and despite [the] untimely submission," Washington v. Delo, 51 F.3d 756, 759 (8th Cir.), cert. denied, 116 S. Ct. 205 (1995), we deny the motion and have reviewed the affidavit.  However, because Trombley's credibility does not "figure[] reasonably in our assessment" of Bannister's actual innocence claim, his second affidavit is irrelevant.  Battle, 64 F.3d at 352.  All subsequent references in this opinion to Trombley's "affidavit" will be to his first affidavit.

money for the job"--that is, Reustman's murder--"and insulate himself from the law by using Bannister as his dupe." Bannister's Opening Br. at 4-5. Trombley's theory "simply does not work to exonerate" Bannister. Battle, 64 F.3d at 352. Indeed, Trombley's theory is that Bannister knowingly and with premeditation murdered Reustman and is thus consistent with the capital murder statute in effect at the relevant time, which provided that "[a]ny person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of capital murder." Mo. Rev. Stat. § 565.001 (1978)[6]

Moreover, as the district court found, the "evidence" in Trombley's affidavit supporting Bannister's theory of an accidental shooting comes from Bannister and thus cannot be considered "new" evidence. In Pickens v. Lockhart, 4 F.3d 1446 (8th Cir. 1993), cert. denied, 114 S. Ct. 1206 (1994), we held that a prosecutor's affidavit stating that a police officer had admitted making a threatening remark to the petitioner was not new evidence. We explained that although petitioner did not know of the existence of the affidavit, "petitioner knew of the basis for the claim the day it arose because he was the person to whom the [threatening] remark

---

[6]In his affidavit, Trombley also suggests that the law enforcement officers had lied about Bannister's statement. Trombley noted that the statement was not written or recorded and was in the third person. He also asserts that before the statement Reustman's brother had informed the police that his brother's death might have been a contract killing. However, as the district court noted, these issues were presented to the jury as the trier of fact. For example, on direct examination, Bannister's counsel called officer Marshall Matthews, an investigating officer. Matthews testified that after the murder and before the arrest, Reustman's brother, who was a deputy sheriff in Illinois, telephoned him "about the possibility of a contract killing." Trial Tr. at V,194. In any event, those portions of Trombley's affidavit that question the weight of the statement and the officers' credibility support a claim of legal, not factual, innocence. See Nolan v. Armontrout, 973 F.2d 615, 617 (8th Cir. 1992) (claim that confession was involuntary was one of legal, not factual, innocence).

-14-

by the interrogating officer was made." Id. at 1450 (internal quotation omitted). Likewise, in this case Bannister knew what Wooten had told him and what his intent was when he confronted Reustman. As the district court observed, "[p]utting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in Schlup." 904 F. Supp. at 1004. See Bowman v. Gammon, 85 F.3d at 1344 ("only thing 'new' at this time is that petitioner's counsel has read the testimony in a new light") (internal quotation omitted).[7]

In addition, contrary to his assertion on appeal and as the district court noted, Bannister is nothing like the petitioner in Schlup, who had asserted his innocence from the beginning. See Schlup, 115 S. Ct. at 855. In contrast, Bannister's theory of the case has changed over time. At trial, Bannister relied on a reasonable doubt defense. In closing argument, Bannister's counsel suggested that Linda McCormick, conspiring with her husband, "did

---

[7]Bannister also argues that the physical evidence supports his claim that the shooting occurred during a struggle. In his affidavit, Trombley notes that the autopsy report showed that the bullet entered Reustman's chest at a sixty degree downward angle and theorizes that because Bannister and Reustman were the same height, "if there had been no struggle, Bannister would have to have been standing one or two feet above Reustman (as on a step ladder) to make the state's argument to be plausible." Affidavit at Paragraph 30. However, the autopsy evidence is not new evidence. See Bowman, 85 F.3d at 1345 (factual basis of claim that autopsy evidence was inconsistent with state's theory of stabbing was reasonably available to petitioner at the time of trial). Indeed, at trial a pathologist testified that the path of the bullet which pierced Reustman's heart "was very sharply downward." Trial Tr. at IV,9. In closing argument, the state explained that the downward path of the bullet could have occurred because Reustman "ducked" when he saw Bannister with a gun. Supp. Tr. at 7. "We [] remind [Bannister] that our role is not to repeat what has been done at trial . . . ." Washington v. Delo, 51 F.3d at 761-762.
However, at this time, we want to point out an error in our previous opinion. In that opinion, 4 F.3d at 1436, we inadvertently and incorrectly stated that Bannister shot Reustman in his head, instead of his heart.

-15-

away" with Reustman.  Supplemental Tr. at 44.  Because eyewitnesses had placed Bannister at the scene of the crime, counsel hypothesized that Bannister was "set up to come down here just in time to be the patsy."  Id. at 45.  Counsel told the jury that under that scenario "Linda McCormick is not even suspected.  She's home free.  Richard [McCormick] is home free, and Alan Bannister is here charged with capital murder."  Id.  In his brief on direct appeal, Bannister argued he was acting under the domination of Wooten, asserting that the "evidence showed that Indian was the go-between and carefully monitored all [Bannister's] actions including seeing that [he] made arrangements to travel from Illinois to Missouri."  Br. in No. 64896 at 23.  Bannister also argued that "Indian was a very mean person and that [he] was afraid of him."  Id. at 23.  In his first post-conviction motion, Bannister advanced a mental disease or defect defense.  In his brief on appeal of the denial of the motion, he asserted that "in light of his "bizarre and incriminating statements to officers, a mental defense was essentially his sole defense."  Br. in No. 14640 at 37.

## B.  Cause and Prejudice

Bannister generally argues that his "allegations of cause and prejudice in pleadings before the district court and his willingness to present evidence in such a hearing indicate that the district court erred in summarily denying relief on procedural grounds without a hearing."  Supplemental Opening Br. at 11.  Because Bannister's attempt to incorporate by reference arguments made in the district court "is prohibited under 8th Cir. R. 28A(j)[,]" Sidebottom v. Delo, 46 F.3d 744, 750 n.3 (8th Cir.), cert. denied, 116 S. Ct. 144 (1995), we will not address those arguments raised in the district court.  However, we address hereinafter any specific arguments as to cause and prejudice Bannister does raise on appeal.

## C.  **Michigan v. Jackson** Claim

In the present petition, Bannister alleged that admission of

his statement given to Sheriff Joe Abramowitz and other law enforcement officers at the Newton County Jail at 10:30 a.m. on August 23, 1982 and evidence obtained therefrom violated his sixth amendment rights under Michigan v. Jackson, 475 U.S. 625 (1986). The district court held that the claim was successive because in Bannister I this court found that the claim was procedurally barred and that Bannister had not alleged sufficient cause and prejudice or actual innocence to permit relitigation of the claim.[8] 904 F. Supp. at 1002. In particular, the district court rejected Bannister's allegation of cause based on his assertion that in Bannister I this court improperly raised a procedural default sua sponte. The court noted that Bannister had raised his allegation of error in his petition for rehearing to this court and in his petition for certiorari to the Supreme Court, and that both petitions had been denied. Id.

In this appeal, Bannister again asserts cause based on our alleged erroneous application of a procedural default. Alternatively, he argues even if he has not established cause or prejudice or actual innocence to permit review of the successive claim, we should review his sixth amendment Jackson claim under the Sanders v. United States, 373 U.S. 1 (1963), "ends of justice" test. Although this court has indicated that the "ends of justice" test is confined to a showing of actual innocence, Ruiz v. Norris, 71 F.3d 1404, 1409 (8th Cir. 1995), cert. denied, 1996 WL 294907 (U.S. Nov. 4, 1996) (No. 95-9119), because Bannister contends that but for error of this court in Bannister I he would be entitled to habeas relief under Michigan v. Jackson, we address but reject his contention.

In his first appeal, Bannister raised both fifth and sixth

---

[8]"A determination of an unexcused . . . procedural bar is a final determination on the merits for purposes of" a successive claim. Caton v. Clarke, 70 F.3d 64, 65 (8th Cir. 1995) (per curiam), cert. denied, 116 S. Ct. 1579 (1996).

amendment challenges to the admission of his August 23 statement. The district court had held that the admission of the statement did not violate Bannister's fifth amendment rights under Edwards v. Arizona, 451 U.S. 477 (1981). In Edwards, the Supreme Court held that after an accused "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation . . . unless the accused himself initiates further communication, exchanges, and conversations with the police." Id. at 484. In addition, under Edwards, the prosecution must "show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983) (plurality opinion). The district court, applying the 28 U.S.C. § 2254(d) presumption of correctness to the state court findings, held that "Bannister had voluntarily initiated conversations with the police after Bannister had requested a lawyer." 807 F.Supp. at 552. The state court had found that Bannister requested counsel at on August 22 at 5:40 a.m. and thereafter initiated conversations with the police, by, among other things, telling officers that he had used an alias when registering at the motel, inquiring about the penalties for capital murder, and on his 6:30 a.m. arrival at the county jail asking to speak to the person in charge.[9] 680 S.W.2d at 147. The district

---

[9]In more detail, as to initiation, the state court found:

Arresting officers twice advised [Bannister] of his Miranda rights and made no attempt to question him. At 5:40 a.m. on August 22, at the Joplin City Jail, [Bannister] again received Miranda warnings. At that time, he refused to sign a waiver form, indicating his desire to wait for an attorney. The questioning ceased. Later, [Bannister] volunteered certain information to officers, including the alias he used at the motel. En route to the Newton County jail, [Bannister] inquired as to the possible punishment for capital murder, expressed regret that he left 'his own profession' of 'robbing banks at which he never got caught,' and speculated about FBI involvement in the current investigation. At 6:30 a.m., following his arrival at the jail, [Bannister] asked to speak to the person in charge. Officers took [Bannister] to the sheriff [Joe Abramowitz], who declined to talk with [Bannister], but invited him to make a telephone call and advised him to tell the truth. [Bannister] initiated each of these

-18-

court also applied the presumption of correctness to the state court findings of fact surrounding the August 23 statement and based on de novo review held that Bannister had knowingly and voluntarily waived his rights. 807 F. Supp. at 552. See Williams v. Clarke, 40 F.3d 1529, 1543 (8th Cir. 1994) (voluntariness of confession subject to de novo review; historical facts subject to presumption of correctness), cert. denied, 115 S. Ct. 1397 (1995). In particular, the district court noted that the officers had repeatedly advised Bannister of his Miranda rights, that he had signed a waiver of those rights, and had expressed his desire to talk to the police. Moreover, the district court noted that the "atmosphere of the questioning (e.g., allowing Bannister to make telephone calls during the time he was cooperating with the sheriff

---

contacts without prompting by the police officers.

State v. Bannister, 680 S.W.2d at 147.

In Bannister I, 4 F.3d at 1439, we indicated that a state court determination of initiation was subject to a section 2254(d) presumption of correctness. However, in light of Thompson v. Keohane, 116 S. Ct. 457 (1996), that statement may no longer be valid. In Thompson, id. at 465, the Supreme Court noted that the courts of appeal were split on whether a state court determination that a defendant was "in custody" for Miranda purposes was subject to a presumption of correctness. The Court held that although the presumption applied to state court findings on the "scene- and action-setting questions[,]" de novo review was required for the "ultimate inquiry" of whether a person was in custody for Miranda purposes. Id. at 465. See Feltrop v. Bowersox, 91 F.3d 1178, 1180 (8th Cir. 1996). Because Bannister has never contested that his statements on August 22 constituted initiation, in this appeal, we need not resolve the correct standard of review of a state court initiation determination. However, assuming de novo review is required, applying the presumption to the "scene- and action-setting" findings, Thompson, 116 S. Ct. at 465, it is clear that Bannister's statements on August 22 "evince[d] a willingness and a desire for generalized discussion about the investigation" and thus constituted initiation. Oregon v. Bradshaw, 462 U.S. at 1045-46 (plurality opinion).

-19-

plus no evidence of physical or psychological coercion), show[ed] that scrupulous attention was given to Bannister's rights." 807 F. Supp. at 552.[10]

In the previous appeal to this court, Bannister did not contest that he initiated conversations with the law enforcement officers on August 22, but argued that the state and district courts had "ignored" the "fact" that he had requested and been appointed counsel at his arraignment, which he claimed occurred at 9:00 a.m. on August 23, 1982. He further argued that because he did not thereafter initiate the conversations with the officers, admission of his post-arraignment statement violated Michigan v. Jackson. In Jackson, 475 U.S. at 636, the Supreme Court held that under the sixth amendment "if police initiate interrogation after

_____

[10]In more detail, as to the circumstances surrounding the statement, the state court found:

> At 10:30 a.m. on August 23, [Bannister] met with the sheriff and two officers at which time they advised him of his Miranda rights. [Bannister] stated he understood his rights and wanted to talk, and signed a written waiver. During conversations that followed Bannister recounted numerous details of the crime. At [Bannister's] suggestion, he accompanied officers to the scene of the murder, where he continued his commentary on the events prior to and immediately following the shooting. During this time, officers reminded [Bannister] that he did not have to cooperate, but he responded that he wanted to talk. Upon their return to the sheriff's office, officers permitted [Bannister] telephone calls and again read him his Miranda rights. [Bannister] then gave officers an account of the crime from its inception to [his] arrest. Although [Bannister] initially used the third person in describing events and never stated he shot Reustman, the extent and detail of the information he provided leaves little doubt of his guilt. Other than the occasional mention of pain from a past injury, [Bannister] did not appear to be in pain during the questioning, did not request immediate medical care or move to halt the interview, and there is no evidence of physical or psychological coercion.

State v. Bannister, 680 S.W.2d at 147.

-20-

a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."

In Bannister I, 4 F.3d at 1440, we found that it was not surprising that the courts had ignored Bannister's assertion that he had been arraigned and appointed counsel at 9:00 a.m. on August 23 and that his post-arraignment confession violated Jackson because the first time Bannister had raised the claim in any court was in a Rule 59(e) motion in the district court. Because a motion under Rule 59(e) is a motion for reconsideration, not initial consideration, we stated that "a Rule 59(e) motion cannot be used to raise arguments which could, and should, have been made before the trial court entered final judgment." Id. (internal quotation omitted); see also Guinan v. Delo, 5 F.3d 313, 316 (8th Cir. 1993) (post-judgment motion cannot be used to "raise claims that either could have been raised in [the original] habeas petition or were raised therein and adjudicated").

We also noted that the state had cited Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), in its brief, and our review of the record indicated an evidentiary default because there was no record support for Bannister's claim that he had been arraigned and appointed counsel at 9:00 a.m. on August 23. 4 F.3d at 1439-40. In his appellate brief, as support for this claim Bannister cited the state court docket sheet and his undated affidavit in the addendum to his brief. However, we noted that the docket sheet did not show the time of the arraignment and that his undated affidavit apparently was presented to the district court for the first time as an exhibit to his Rule 59(e) motion. Id. at 1440.

In this appeal, Bannister does not contest that he first raised the claim in the Rule 59(e) motion, or that he failed to make a record in the state court that he had been arraigned and

appointed counsel at 9:00 a.m. on August 23, 1982.[11]  Rather, he argues that this court should have addressed the merits of his Jackson claim because the state waived any evidentiary default.  See Miller V. Lockhart, 65 F.3d 676, 680 (8th Cir. 1995).  He asserts that we read the state's citation of Keeney too broadly and, in any event, at oral argument the state conceded the factual basis of the claim by stating "then the next day there was the court proceeding and then at 10:30 a.m. the statement began." Appendix at 65.  Alternatively, Bannister argues that we unfairly raised the evidentiary default sua sponte, without affording him the opportunity to establish cause and prejudice.  See United States v. Fallon, 992 F.2d 212, 213 (8th Cir. 1993) (court can raise abuse of writ sua sponte "so long as the petitioner is given adequate opportunity to respond").  Bannister argues if given the opportunity at an evidentiary hearing he could prove cause, asserting that counsel was ineffective for failing to develop the claim in the state courts.  As to prejudice, he claims that if his August 23 statement and evidence obtained therefrom had been excluded, he would be acquitted.

The state responds that it did not waive the default, that Bannister has taken its statement at oral argument out of context, and, in any event, the statement cannot be considered as a binding judicial admission to create a record where no factual record exists.[12]  Alternatively, the state

_____

[11]Bannister argues that he raised the claim in his Rule 59(e) motion because the "timing of the arraignment was not an issue until the district court failed to note the critical fact when it denied the claim in the first habeas proceeding."  Reply Br. at 8. However, because there is no record support that Bannister was arraigned at 9:00 a.m. on August 23, the district court cannot be faulted for failing to note this non-existent "fact."

[12]In certain circumstances, a court may rely on a counsel's statement at oral argument as a judicial admission, Carson v. Pierce, 726 F.2d 411, 412 (8th Cir. 1984) (order).  However, in the circumstances of this case, we agree with the state that its comments at oral argument do not have "sufficient formality or conclusiveness to be considered a judicial admission."  Rowe Int'l, Inc. v. J-B Enterp. Inc., 647 F.2d 830, 836 (8th Cir. 1981); Peltier v. Henman, 997 F.2d 461, 469 (8th Cir. 1993) (counsel's ambiguous statement at oral argument could not be considered concession).

-22-

asserts that this court can

raise a procedural default sua sponte, citing <u>Prewitt v. Goeke</u>, 978 F.2d 1073, 1077-78 (8th Cir. 1992), and in this case, as a matter of law under <u>Murray v. Carrier</u>, 477 U.S. 478, 489 (1986), Bannister cannot rely on ineffective assistance of trial or appellate counsel as cause for the default because he failed to raise such a claim as an independent claim in the state court.

In any event, the state asserts that we need not address Bannister's arguments concerning the default in the state courts, because, aside from the evidentiary default in state court and his failure to timely raise the claim in the district court in his first petition,[13] he is not entitled to relief under <u>Jackson</u> by the nonretroactivity principles of <u>Teague v. Lane</u>, 489 U.S. 288 (1989).  In <u>Bannister I</u>, we noted that Bannister could not rely on <u>Jackson</u> in his direct appeal because the case had been decided after Bannister's conviction became final.  We acknowledged that the state had not raised a <u>Teague</u> objection and that the Supreme Court had indicated that the <u>Teague</u> bar was not jurisdictional, but noted that courts had held that <u>Jackson</u> established a "new rule" for <u>Teague</u> purposes.  4 F.3d at 1440 n.7.

Because we agree with the state that Bannister is not entitled to habeas relief under <u>Teague v. Lane</u>, we do not address his arguments concerning the evidentiary default.  <u>See</u> <u>Spaziano v. Singletarry</u>, 36 F.3d 1028, 1041 (11th Cir. 1994) ("We need not address the procedural default issue or the merits, because we conclude that the claim is <u>Teague</u>-barred."), <u>cert. denied</u>, 115 S.

---

[13]In <u>Bannister I</u>, 4 F.3d at 1445, we stated that a claim raised for the first time in a post-judgment motion can be considered abusive.

Ct. 911 (1995). However, as he does with his default argument, Bannister argues that because the state did not raise a _Teague_ issue this court should not have raised the issue sua sponte. We disagree. Since our decision in _Bannister I_, the Supreme Court has made "clear that [a federal] court ha[s] discretion to address the _Teague_ issue even in the presence of a waiver." _Jones v. Page_, 76 F.3d 831, 850 (7th Cir.), _cert. denied_, 1996 WL 395965 (U.S. Oct. 21, 1996) (No. 96-5064). In other words, even if "[t]he state does not cite _Teague_, [] we are free to apply it anyway." _Bracy v. Gramley_, 81 F.3d 684, 689 (7th Cir.), _petition for cert. filed_, (U.S. Sept. 23, 1996) (No. 96-6114). _Accord_ _Spaziano_, 36 F.3d at 1041 ("The Supreme Court has made clear that even where the State does not argue the _Teague_ bar at all, a federal court has discretion to decide whether the bar should be applied.)[14]

In _Caspari v. Bohlen_, 510 U.S. 383, 389 (1994), the Supreme Court stated that even though "the nonretroactivity principle is not jurisdictional in the sense that federal courts . . . must raise . . . the issue sua sponte . . . a federal court may, <u>but need not</u>, decline to apply _Teague_ if the State does not argue it." (Emphasis added; internal quotation omitted). _See also_ _Schiro v. Farley_, 510 U.S. 222, 229 (1994) (Court "undoubtedly" had discretion to reach _Teague_ issue even though state had failed to argue it in its brief in opposition to certiorari petition). In _Caspari_, the court explained:

---

[14]In an analogous context, this court has made clear that a federal court need not accept the state's express waiver of the exhaustion defense. _Victor v. Hopkins_, 90 F.3d 276, 278 (8th Cir. 1996) (citing _Duvall v. Purkett_, 15 F.3d 745, 747 n.4 (8th Cir.), _cert. denied_, 114 S. Ct. 2753 (1994)). In _Duvall_, we explained that "'[t]he purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to a federal court.'" 15 F.3d at 746 n.4 (quoting _Keeney v. Tamayo_, 504 U.S. at 10). We stated: "We should no more tolerate disregard for this principle by the State than by the habeas petitioner." _Id._

-25-

> The nonretroactivity principle <u>prevents</u> a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final. A threshold question in every habeas case, therefore, is whether the court is obligated to apply the <u>Teague</u> rule to the defendant's claim.

510 U.S. at 389 (internal citation omitted).

In this appeal, Bannister concedes that <u>Jackson</u> was decided after his conviction became final in 1985 when certiorari was denied on his direct appeal, but argues that <u>Jackson</u> did not create a new rule for <u>Teague</u> purposes. We disagree. "[A] case announces a new rule if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final." <u>Teague</u>, 489 U.S. at 301. Bannister argues that <u>Jackson</u> was not a new rule because it was dictated by <u>Massiah v. United States</u>, 377 U.S. 201 (1964), and <u>Brewer v. Williams</u>, 430 U.S. 387 (1977). Again, we disagree. In <u>Massiah</u>, 377 U.S. at 206, the Supreme Court held that a defendant's fifth and sixth amendment rights to counsel were violated when government agents had surreptitiously elicited incriminating statements from the defendant after he had been indicted. In <u>Brewer</u>, 430 U.S. at 400, the Court also held that a defendant had not waived his sixth amendment right to counsel when government agents had elicited incriminating statements from him. However, in <u>Brewer</u>, the Court emphasized that it was not holding that the defendant "<u>could not</u>, without notice to counsel, have waived" his sixth amendment right to counsel, only that under the circumstances of the case, "he did not." <u>Id.</u> at 405-06.

Indeed, the Supreme Court has "explicitly described its holding in <u>Jackson</u> as 'establish[ing] . . . a new Sixth Amendment rule.'" <u>Jones</u>, 76 F.3d at 853 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 179 (1991)). "Not surprisingly, at least five other circuits have determined that the holding in <u>Jackson</u> represents a 'new rule' for purposes of <u>Teague</u> analysis." <u>Id.</u> (citing <u>Flamer v.</u>

-26-

<u>Delaware</u>, 68 F.3d 710, 720-21 (3d Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 807 (1996); <u>Self v. Collins</u>, 973 F.2d 1198, 1207 (5th Cir. 1992), <u>cert. denied</u>, 507 U.S. 996 (1993); <u>Greenwalt v. Rickets</u>, 943 F.2d 1020, 1026 (9th Cir. 1991), <u>cert. denied</u>, 506 U.S. 888 (1992); 952 F.2d 1567, <u>Collins v. Zant</u>, 892 F.2d 1502, 1510-12 (11th Cir.), <u>cert. denied</u>, 498 U.S. 881 (1990)).

Bannister argues that even if <u>Jackson</u> is a new rule it falls within the <u>Teague</u> exception for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." <u>Gray v. Netherland</u>, 116 S. Ct. 2074, 2084 (1996). However, "[t]he Supreme Court has interpreted this category very narrowly and we do not believe that the [<u>Jackson</u>] rule . . . falls within the 'small core of rules requiring . . . procedures that are implicit in the concept of ordered liberty[,]'" <u>Jones</u>, 76 F.3d at 853-54 (quoting <u>Graham v. Collins</u>, 506 U.S. 461, 478 (1993)), and "without which the likelihood of an accurate conviction is seriously diminished." <u>Teague</u>, 489 U.S. at 313. Rather, "<u>Jackson</u> involves [a] prophylactic rule providing [a] second layer of protection." <u>Collins</u>, 892 F.2d at 1511 (internal quotation omitted); <u>accord</u> <u>Flamer</u>, 68 F.3d at 723-24 (<u>Jackson</u> not a "watershed" rule but a "prophylactic rule that provides one means of protecting a constitutional right"); <u>cf.</u> <u>Greenwalt</u>, 943 F.2d at 1025 ("watershed" exception inapplicable because new rule was "a prophylactic rule which results in exclusion of probative trial evidence").

Therefore, we hold that, evidentiary defaults aside, Bannister would not be entitled to relief under <u>Jackson</u>.

## D. Ineffective Assistance of Counsel

In the present petition, Bannister argues that counsel was ineffective during the guilt phase for failing to investigate and present evidence that Bannister was not a hired killer. The district court held that this claim was successive because

Bannister had raised the claim in his previous petition, and the court found that it was procedurally defaulted and Bannister had not alleged sufficient cause and prejudice or actual innocence to excuse the default. 904 F. Supp. at 1005. On appeal, Bannister argues that he has alleged sufficient cause to permit review of the successive claim because the district court was "simply incorrect" in holding that he did not establish cause to excuse the default. This is an insufficient allegation of cause. "In general to show cause, petitioner must show that 'some objective factor external to the defense impeded counsel's efforts' in raising the claims earlier." Nachtigall v. Class, 48 F.3d 1076, 1079 (8th Cir. 1995) (quoting Cornman v. Armontrout, 959 F.2d 727, 729 (8th Cir. 1992)). "To show cause in the context of successive or abusive claims, petitioner must show that the claims are 'based on facts or legal theories of which he had no knowledge when prosecuting his prior habeas petition.'" Id. (quoting Cook v. Lockhart, 878 F.2d 220, 222 (8th Cir. 1989)).

Moreover, as the state points out, in his previous appeal Bannister did not challenge the district court's holding that his guilt-phase ineffective assistance claim was procedurally defaulted. Therefore, "[b]ecause [Bannister] did not appeal the federal district court's ruling of state procedural default," he cannot "collaterally attack that unappealed [holding] in this proceeding by arguing that he had cause to excuse the state procedural default." Hawkins v. Evans, 64 F.3d 543, 546 n.2 (10th Cir. 1995).

Nonetheless we have reviewed Bannister's arguments and conclude that the district court did not err in holding that his ineffective assistance claim was defaulted. Contrary to his assertions, the summary denials of a second Rule 27.26 motion and a belatedly filed Rule 91 motion do not "open[] up the merits" of the claim. Charron v. Gammon, 69 F.3d 851, 857 (8th Cir. 1995), cert. denied, 116 S. Ct. 2533 (1996). Nor did the district court

err in holding that Bannister had failed to demonstrate cause for the default. Bannister argues that the refusal of the first Rule 27.26 court to grant him a continuance was state interference, which "actually prevented post-conviction counsel from raising the claims and presenting the evidence in state court." Zeitvogel v. Delo, 84 F.3d 276, 279 (8th Cir.), cert. denied, 1996 WL 514188 (U.S. Oct. 21, 1996) (No. 96-5765). He is mistaken. We first note that Bannister's counsel requested the continuance to obtain psychological information and information from an investigating officer. In addition, although the court denied the request for a continuance, it allowed counsel additional time to submit "something that in good faith [he] fe[lt] [wa]s significant." Tr. of 27.26 Hearing at 51. However, counsel did not submit any additional information or ask for additional time. We also reject Bannister's assertion that Missouri's "insufficient funding of [post-conviction] counsel prevented counsel from investigating and raising the claim." Kennedy v. Herring, 54 F.3d 678, 684 (11th Cir. 1995). "[F]inding cause in a lack of resources would be inconsistent with the settled principle that a state need not provide counsel in collateral proceedings, even for petitioners under sentence of death." Id. Also not establishing cause is post-conviction counsel's case load, which allegedly was heavy and prevented him from devoting more time to this case. See LaRette v. Delo, 44 F.3d 681, 687 (8th Cir.) (counsel's alleged lack of time did not establish cause), cert. denied, 116 S. Ct. 246 (1995).

In any event, Bannister cannot establish cause for any procedural bar because the factual basis of his claim that he was not a hired killer was reasonably available to counsel since Bannister knew whether or not he was a hired killer. See Forrest v. Delo, 52 F.3d 716, 719 (8th Cir. 1995) (delay in providing transcript of plea hearing was not cause for counsel's failure to raise claim of judicial coercion of guilty plea since petitioner "did not need a transcript to know whether . . . he was coerced

into pleading guilty") (internal quotation omitted).[15]   As the Supreme Court explained in McClesky v. Zant, 499 U.S. 467, 498 (1991), "[i]f what petitioner knows . . . supports a claim for relief . . . what he does not know is irrelevant.  Omission of the claim will not be excused merely because evidence discovered later might also have strengthened the claim."

IV.  **Sentencing Phase Claims**

The jury recommended a sentence of death, finding two statutory aggravating circumstances--that the murder was committed for the purpose of receiving money, Mo. Rev. Stat. § 565.012.2(4) (1978) and that Bannister had a substantial history of serious assaultive convictions, Id. at § 565.012(1).  At the sentencing phase, the state introduced records showing that Bannister had convictions for armed robbery, burglary, rape and deviate sexual assault.  In his direct appeal, the state supreme court noted that Bannister had conceded that a jury could reasonably find that several of his prior convictions were "for offenses of a 'serious assaultive' nature" and found that Bannister's death sentence "was not excessive or disproportionate to the penalty imposed in similar cases considering the crime, the defendant, and the strength of the evidence." 680 S.W.2d at 149.

A.  **Ineffective Assistance of Counsel**

In the current petition, Bannister alleges ineffective assistance of counsel at the penalty phase due to counsel's failure to investigate and present evidence that would have cast doubt on the two statutory aggravating circumstances.  He also argues that his fourteenth amendment due process rights were violated because

---

[15]Because the district court correctly found that the ineffective assistance claim was defaulted and Bannister had not established cause to excuse the default, the "court properly refused to conduct an evidentiary hearing [or allow discovery] on the issue of cause" or on the merits. Zeitvogel, 84 F.3d at 281-82.

the Missouri Supreme Court failed to conduct the type of proportionality review mandated by state statute. The district court found that the claims were abusive and that Bannister had failed to demonstrate cause and prejudice or actual innocence to permit review. 904 F. Supp. at 1005-06.

On appeal, Bannister argues that he supported the claims with a showing that he was actually innocent of the death penalty. Although Schlup establishes the standard for demonstrating actual innocence in the guilt phase, "[t]he Sawyer v. Whitley standard remains the benchmark for actual innocence claims involving eligibility for the death penalty." Nave v. Delo, 62 F.3d 1024, 1032 (8th Cir. 1995), cert denied, 116 S. Ct. 1837 (1996). "Under the Sawyer standard, [Bannister] must show that by clear and convincing evidence that but for the constitutional error, no reasonable juror would have found him eligible for the death penalty under Missouri law." Id. Bannister can "succeed on his claim only 'by showing no aggravating circumstance existed, or by showing some other condition of eligibility was not met. Additional mitigating evidence does not satisfy the standard. '" Id. at 1033 (quoting Shaw v. Delo, 971 F.2d 181, 186 (8th Cir. 1992), cert. denied, 507 U.S. 927 (1993)).[16]

_____

[16]Bannister also argues that he is ineligible for the death penalty because had counsel investigated and presented mitigating evidence the jury would have found that the mitigating circumstances outweighed the aggravating circumstances. His argument is predicated on an incorrect assumption. Missouri is not a weighing state. Indeed, Bannister concedes that this court has so held, see, e.g., Sidebottom v. Delo, 46 F.3d at 756; LaRette v. Delo, 44 F.3d at 687 n.4, but argues that these cases are wrongly decided. However, as a panel of this court, we are not free to overrule these cases. Therefore, we do not address in detail Bannister's ineffective assistance allegations regarding mitigating factors because they "'do not affect his eligibility for the death penalty.'" Nave v. Delo, 62 F.3d at 1033 (quoting Shaw, 971 F.2d at 187). In other words, "[e]ven if the 'new' evidence had been admitted and the jury had been instructed on statutory mitigating circumstances, a reasonable juror could still find the aggravating factors making [Bannister] eligible for the death penalty." Shaw v. Delo, 971 F.2d at 187. We nonetheless note that in Bannister I, 4 F.3d at 1441-43, we held that his claim that counsel was ineffective for failing to investigate and present alleged mitigating evidence from family, acquaintances, and a teacher was procedurally defaulted.

Bannister asserts that the Trombley affidavit demonstrates that he is actually innocent of the underlying crime and also demonstrates that he is innocent of the aggravating circumstance that he killed Reustman for the purpose of receiving money. For the reasons discussed above, Trombley's affidavit does not meet the more lenient <u>Schlup</u> standard; it certainly does not meet the stricter <u>Sawyer</u> standard. Trombley's affidavit, which is based primarily on hearsay, speculation, and Bannister's belated claims, certainly is not "clear and convincing evidence" which would cause a reasonable juror to have rejected the state's evidence that Bannister had murdered Reustman for the purpose of receiving money.

Although we need not address Bannister's argument that he was innocent of the second aggravating factor of having a substantial history of serious assaultive convictions, <u>see</u> <u>Sloan v. Delo</u>, 54 F.3d 1371, 1385 (8th Cir. 1995) (under Missouri law finding of at least one aggravating circumstance makes defendant eligible for death penalty), <u>cert. denied</u>, 116 S. Ct. 728 (1996), we address it but find it is without merit. Bannister asserts had counsel investigated and presented the jury with the circumstances surrounding his convictions for rape, armed robberies and deviate sexual assault, the jury would not have found his conduct to be of a serious, assaultive nature. As "new" evidence in support of his claim, he relies on Trombley's affidavit and affidavits of family and friends. For example, in his affidavit Trombley states that his investigation revealed that Bannister should only have been charged with contributing to the delinquency of a minor and not rape because Bannister and the sixteen year old victim had been having consensual intercourse for months, and the rape charge was

_____

brought by the victim's aunt after Bannister spurned her sexual advances. Affidavit at Paragraph 32. As to the deviate sexual assault and one of the armed robbery convictions, Trombley believed that counsel should have explained that all Bannister and a codefendant did was "engage[] two prostitutes with whom [they] had sex" and "[a]fter completing the transaction took back the money that had been paid to the prostitutes, and had further sexual contact with one of the prostitutes." Id. at 33. On appeal Bannister relies heavily on the affidavit of Steven Maurer, a law enforcement officer who had been a friend of Bannister for 22 years. Maurer states that although he could not be "totally objective with regard to [his] impressions" of Bannister, he believed that "most of [Bannister's] criminal history and record was apparently misrepresented and exaggerated at trial." In particular, Maurer noted his belief that the arresting officer had deceived Bannister into pleading guilty to rape instead of the lesser charge of contributing to the delinquency of a minor and that the medical evidence did not support the rape victim's allegation that Bannister had forcibly raped and assaulted her.

We agree with the district court that Bannister's "evidence" does not come close to meeting the Sawyer standard. First, as the district court noted, none of the alleged circumstances set forth in the affidavits can be considered new evidence because "certainly Bannister knew what he had done which led to the convictions long before November 29, 1994, when he filed the [instant] petition." Order of Dec. 5, 1994 at 7. See Sloan, 54 F.3d at 1381 (petitioner had facts necessary to present failure to investigate claim since "he would have known that other individuals were aware of the mitigating circumstances"). In any event, we have no hesitation in concluding had the jurors been presented with the "circumstances" as set forth in the affidavits, no reasonable juror would have found that the rape, armed robberies and deviate sexual assaults were not serious, assaultive convictions.

**B. Proportionality Claim**

Last, we address Bannister's assertion that the Missouri Supreme Court failed to maintain the data base of death penalty cases as mandated by state statute, Mo. Rev. Stat. § 565.014 (1978) (repealed and replaced by Mo. Rev. Stat. § 565.014 (1986)), and thereby deprived him of his due process rights under the fourteenth amendment.[17]  In support of his claim Bannister submitted the affidavits of two assistant state public defenders, who stated that in 1989 and 1990 they had learned that the Missouri Supreme Court's data base of death penalty cases was incomplete.  Bannister also submitted a study commissioned by the public defender's office, which indicated that as of July 1, 1994, 189 cases of inmates who had been sentenced to life in prison without the possibility of parole were not in the data base in violation of the statute.  Bannister also argued that several of the omitted cases in which  defendants had received life sentences were more similar to his case than the cases the Missouri Supreme Court had relied upon in conducting its review.  The district court found that the claim was abusive and that Bannister had not presented cause and prejudice or actual innocence to permit review.  Although we are inclined to agree with the district court, we do not address its abuse analysis. Even if the claim were not abusive, Bannister would not be entitled to relief.

This court has rejected virtually identical challenges to the Missouri Supreme Court's proportionality review.  In <u>Williams v. Delo</u>, 82 F.3d 781, 784 (8th Cir. 1996), the petitioner argued that his due process rights were violated "because about two hundred Missouri capital murder cases were not in the files the court used to review the proportionality of [his] sentence."  We disagreed, holding that "[n]ot only is this claim abusive, but [petitioner]

---

[17]Bannister recognizes that the eighth amendment does not require proportionality review.  <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 50-51 (1984).

-34-

cannot show a due process violation because the Missouri Supreme Court conducted a reasoned review of his sentence." Id. at 784-85. We explained that a federal court "cannot look behind the Missouri Supreme Court's conclusion or consider whether that court misinterpreted the Missouri statute requiring proportionality review." Id. at 785 (citing LaRette v. Delo, 44 F.3d at 688).

In Williams, the court also added that petitioner had not "explain[ed] why the added cases [wer]e pertinent or how they would have affected the proportionality review." Id. However, in Six v. Delo, 94 F.3d 469, 478 (8th Cir. 1996), in addition to arguing that the Missouri Supreme Court's capital data base was missing "189 cases in which life sentences were imposed[,]" the petitioner "cite[d] some of the omitted published cases and argue[d] they [wer]e more similar to [his] case than the [] capital cases cited by the Missouri Supreme Court in upholding [the] death sentence." This court nonetheless rejected his due process argument, holding that petitioner "was not arbitrarily denied his state-provided right to proportionality review." Id. Citing Williams, we reiterated that "[t]he Constitution does not require us to look behind" the Missouri Supreme Court's conclusion that the death sentence was not disproportionate "to consider the manner in which the court conducted its review or whether the court misinterpreted the Missouri statute." Id.[18] Thus, Bannister is

_____

[18]We note that the study upon which Bannister relies in support of his assertion that the capital data base is incomplete indicates that it was submitted to the Missouri Supreme Court in State v. Parker, 886 S.W.2d 908 (Mo. 1994) (en banc), cert. denied, 115 S. Ct. 1827 (1995). In Parker, the state court considered three analytical studies on its proportionality review, but found that the studies did not appear to aid the court "in conducting a proportionality review." Id. at 933. The court stated that "[p]roportionality review 'merely provides a backstop against the freakish and wanton application of the death penalty.'" Id. (quoting State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993) (en banc), cert. denied, 114 S. Ct. 1664 (1994)). In addition, the court responded to the argument that Bannister and Six raised in their federal habeas cases--that because some of the omitted cases in which life sentences were imposed were allegedly similar to their cases, their sentences were disproportionate. The Missouri Supreme Court pointed out that "[t]he issue in proportionality review is 'not whether any similar case can be found in which the jury

-35-

not entitled to

---

imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of "similar cases" as a whole[,]'" considering the crime, the evidence, and the defendant. Id. at 934 (quoting State v. Shurn, 866 S.W.2d 447, 468 (Mo. 1993) (en banc), cert. denied, 115 S. Ct. 118 (1994)). See also State v. Chambers, 891 S.W.2d 93, 113-14 (Mo. 1995) (en banc) (revisiting Parker data but rejecting proportionality challenge).

relief on his proportionality challenge.

## V.  Conclusion

Accordingly, we affirm the judgment of the district court dismissing Bannister's successive petition for a writ of habeas corpus.[19]


BRIGHT, Circuit Judge, dissenting.


I respectfully dissent.


Justice Blackmun noted that "the death penalty remains fraught with arbitrariness" and "cannot be administered consistently and rationally" even when states follow their procedural safeguards. Callins v. Collins, 510 U.S. 1141, 1144, 1147 (1994) (Blackmun, J., dissenting) (citations omitted).  When a state fails to follow its procedural safeguards, the administration of the death penalty

---

[19]We have considered the arguments raised in the briefs of the amici curiae.  The briefs reiterate Trombley's assertions that Bannister is actually innocent of capital murder and argue that execution of an innocent person would violate international law and human rights.  However, for reasons previously discussed, Bannister has not established his actual innocence under the precedents of this court and the United States Supreme Court, which we are bound to follow.  In addition, the Lyon Bar Association argues that Bannister should not be executed because he has the "potential to reinsert himself in society," but acknowledges this argument "is better suited to an appeal for executive clemency from the Governor of Missouri."

becomes irrational.  Alan Bannister's death sentence exemplifies such an arbitrary and irrational outcome because the state supreme court's proportionality review neglected to include life imprisonment cases as mandated by state law.

The Missouri Supreme Court relies on a data base to conduct a proportionality review of all capital punishment sentences.  Bannister asserts that the Missouri Supreme Court failed to properly maintain this data base of capital cases as mandated by Missouri law.  Mo. Rev. Stat. § 565.014 (1978) (repealed and replaced by Mo. Rev. Stat. § 565.014 (1986)).  Specifically, although the state supreme court considered four capital punishment cases during Bannister's proportionality review, he argues that 189 life sentence cases omitted from the State's data base reveal the disproportionality of his death sentence, and their omission deprived him of his fourteenth amendment protections.  The district court regarded the claim as abusive, and found that Bannister failed to show cause and prejudice for not raising the claim in his earlier habeas petition.  Appellant's App. at A8-A11 (Dist. Ct. Order, Dec. 5, 1994).  I disagree.

**I.  Bannister Demonstrated Cause and Prejudice for Failing to Present Claim Regarding Proportionality Review in First Habeas Petition.**

The district court found that Bannister failed to raise the proportionality claim in his earlier habeas petition thereby constituting an abuse of the writ.  Id. at A9.  Thus, Bannister must show cause and prejudice for his failure to raise the claim earlier.  See McClesky v. Zant, 111 S. Ct. 1454, 1470 (1991).  The district court ruled that Bannister failed to show cause and prejudice.  Appellant's App. at A9-A10 (Dist. Ct. Order, Dec. 5, 1994).  According to the district court, "Since 1984 Bannister has had the argument that he now advances that the . . . cases cited by the [Missouri] Supreme Court in its proportionality review are not

comparable to Bannister's situation." Id.

I disagree. According to Murray v. Carrier, 477 U.S. 478, 488 (1986)(quoting Brown v. Allen, 344 U.S. 443, 486 (1953)), an external "objective impediment . . . [such as] 'interference by officials' [that] made compliance impracticable" constitutes cause. The Missouri Supreme Court's failure to maintain its data base without disclosing the omission of life sentence cases to Bannister and others exemplifies interference by the State.

Moreover, the interference not only made it impractical for Bannister to bring the claim, the interference made it impossible for Bannister to bring the claim. Bannister could not bring his claim until he learned of the omission. Presumably we do not require a defendant to maintain his own data base. Furthermore, although Bannister could have contested the disproportionality of his sentence compared to the cases used by the state supreme court, he could not have demonstrated the disproportionality until he learned of the omitted cases. As the Fourth Circuit acknowledged in Peterson v. Murray, 904 F.2d 882, 887 (4th Cir. 1990), although the state court discussed only the most relevant cases in its proportionality review, its decision survived attack in federal habeas because the state court reviewed all capital murder cases. Thus, a state court need not discuss every case it reviews, but it must review all relevant cases.

Accordingly, that the Missouri Supreme Court cited and discussed certain cases does not preclude Bannister from challenging whether the state court reviewed all relevant cases. The State's failure to disclose the omission of life sentence cases from its data bank prevented Bannister from bringing his claim earlier. As discussed below, the state court's failure to consider the omitted cases clearly prejudiced Bannister in his proportionality review. As a result, Bannister demonstrated both

-39-

cause and prejudice allowing this court to reach the merits of his claim.

## II. Prior Cases Do Not Dictate the Outcome of Bannister's Proportionality Review Claim.

The majority relies on this court's earlier cases to reject Bannister's claim on its merits. Slip op. at 32-34. The majority interprets these cases as precluding this court from reviewing the State's proportionality review procedure for fourteenth amendment violations. Id. With all due respect, the majority misconstrues this court's earlier cases.

In Foster v. Delo, 39 F.3d 873, 882-83 (8th Cir. 1994)(citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984), cert. denied, 115 S. Ct. 1719 (1995)), we recognized that the federal Constitution does not require a state to conduct a proportionality review of a death sentence. We also acknowledged, however, that when state law requires such review "the Fourteenth Amendment of course entitles [the defendant] to procedures to ensure that the right is not arbitrarily denied." Foster, 39 F.3d at 883 (citing Wolff v. McDonald, 418 U.S. 539, 557 (1974)).

This court's prior cases held that the particular petitioners each failed to demonstrate an arbitrary denial of their state-created right to a proportionality review. See, e.g., Six v. Delo, 94 F.3d 469, 478 (8th Cir. 1996); Williams v. Delo, 82 F.3d 781, 784-85 (8th Cir. 1996); LaRette v. Delo, 44 F.3d 681, 688 (8th Cir.), cert. denied, 116 S. Ct. 246 (1995); Foster, 39 F.3d at 882-83. Each case concerned particularly brutal and heinous crimes such that the omission of life sentence cases did not render the proportionality reviews arbitrary. See Six, 94 F.3d at 472-73, 478 (describing crime and ruling that defendant was not arbitrarily denied proportionality review before discussing limits of federal court review of state's proceedings); Williams, 82 F.3d at 785

(noting in dicta that prisoner failed to show how omitted cases would affect outcome of proportionality review); cf. Williams I, 912 F.2d 924, 927 (8th Cir. 1990)(describing crime); LaRette, 44 F.3d at 684; Foster, 39 F.3d at 876-77.  Although this court denied relief in each case, these rulings have never placed the State's proportionality review completely outside fourteenth amendment protection.

The majority seems to overlook the arbitrariness step in its analysis, but focuses instead on often-quoted language that "[w]e cannot look behind the Missouri Supreme Court's conclusion or consider whether that court misinterpreted the Missouri statute requiring proportionality reviews."  Williams, 82 F.3d at 785 (citing LaRette, 44 F.3d at 688), quoted in slip op. at 32; see also Six, 94 F.3d at 478.  We must place this language in proper context.  In Walton v. Arizona, 497 U.S. 639 (1990), the Supreme Court noted that "the Arizona Supreme Court plainly undertook its proportionality review in good faith and found that Walton's sentence was proportional to the sentence imposed in cases similar to his.  The Constitution does not require us to look behind that conclusion."  Id. at 656 (emphasis added).  LaRette and subsequent cases quote Walton without noting that the Supreme Court determined that the state court acted in good faith before discussing the limitations of constitutional scrutiny.  See LaRette, 44 F.3d at 688; see also Six, 94 F.3d at 478; Williams, 82 F.3d at 784.  A careful reading of these cases reveals, however, that before reiterating the mantra incompletely carved from Walton, this court found that each defendant "was not arbitrarily denied his state-provided right to proportionality review."  Six, 94 F.3d at 478 (emphasis added); see also Williams, 82 F.3d at 785.  Significantly, Six cited Eighth Circuit precedent recognizing that a state's proportionality review remains subject to the fourteenth amendment's protections.  See Six, 94 F.3d at 478 (citing Foster, 39 F.3d at 882).

Thus, we have never abandoned the notion that the fourteenth amendment requires the Missouri Supreme Court to conduct its proportionality review in good faith. Before mechanically refusing to "look behind" the Missouri Supreme Court's conclusion, we must first ensure that Bannister was not arbitrarily denied his state-provided right to proportionality review.

### III. Cases Omitted from Missouri Supreme Court's Data Base Demonstrate Disproportionality of Death Penalty.

According to the Missouri Supreme Court, "The issue in proportionality review is 'not whether any similar case can be found in which the jury imposed a life sentence, but rather, whether the death sentence is excessive or disproportionate in light of similar cases as a whole.'" State v. Parker, 886 S.W.2d 908, 934 (Mo. 1994)(en banc)(quoting State v. Shurn, 866 S.W.2d 447, 468 (Mo. 1993)(emphasis added), cert. denied, 115 S. Ct. 1827 (1995)). State law requires a comparison of Bannister's penalty to those "imposed in similar cases considering the crime, the defendant, and the strength of the evidence." State v. Bannister, 680 S.W.2d 141, 149 (Mo. 1984)(en banc); see Mo. Rev. Stat. § 565.035.3(3).

The omission of life sentence cases from the Missouri Supreme Court's data bank prevented the court from considering similar cases as a whole. The state supreme court used four capital punishment cases in its proportionality review of Bannister's sentence, all of which offer only superficial similarities to Bannister's case.[20] See State v. Bannister,

_____

[20]In each of the four cases used by the Missouri Supreme Court, State v. Bannister, 680 S.W.2d 141, 149 (Mo. 1984), the defendant committed other crimes during the course of the murder. See State v. Gilmore, 661 S.W.2d 519, 520-22 (Mo. 1983), (burglary, vandalism and robbery); State v. McDonald, 661 S.W.2d 497, 500 (Mo. 1983)(armed robbery); State v. Stokes, 638 S.W.2d 715, 717 (Mo. 1982)(armed robbery, auto theft and possibly rape); State v. Blair, 638 S.W.2d 739, 743-44, 759 (Mo. 1982)(theft, burglary, armed robbery, and kidnapping).

In addition, the defendants in the other cases committed

-42-

several deadly acts to ensure the death of their victims while increasing their suffering. See Gilmore, 661 S.W.2d at 522 (shot victim twice to ensure death); McDonald, 661 S.W.2d at 500-01 (shot wounded victim again to ensure death); Stokes, 638 S.W.2d at 724 (beat victim, repeatedly stabbed her, used apron to strangle, and strangled her manually causing death); Blair, 638 S.W.2d at 744 (bludgeoned victim with brick and shot her three times).

Finally, Bannister's crime differed from these cases based on the victims' characteristics. See Gilmore, 661 S.W.2d at 521-22, 525 (killing 83-year-old woman to prevent her from making identification); McDonald, 661 S.W.2d at 507 (killing police officer); Blair, 638 S.W.2d at 759-60 (noting that crime represented "not just a contract killing, but . . . kill[ing] the victim of and sole witness to another crime (rape) to prevent her from testifying. Such a murder strikes at the heart of the administration of justice. . . . It is difficult to conceive of a crime more inimical to our society . . . .").

Furthermore, the defendants in the cases used in the proportionality review demonstrated more callousness and brutality during the commission of their crimes than Bannister. See Gilmore, 661 S.W.2d at 522 (noting victim suffered and pleaded for mercy, defendant's decision to prey on elderly, defendant's constant mockery of victim's last words, and defendant's bragging about murder to relatives, "seemingly deriving an almost sensual joy from telling of the crime"); Stokes, 638 S.W.2d at 724 (describing injuries consistent with prolonged struggle by victim); McDonald, 661 S.W.2d at 500 (noting defendant's attack in front of victim's daughter); Blair, 638 S.W.2d at 758-59 (noting defendant took part in terror campaign against victim, ignored victim's pleas for mercy and demonstrated no remorse). In addition, two of the other defendants committed previous homicides. See Gilmore, 661 S.W.2d at 523 (noting defendant's confession to another dual murder); Stokes, 638 S.W.2d at 724 (noting prior homicide convictions).

Finally, the evidence against the other defendants carried more constitutional reliability. The evidence in the four capital punishment cases included witnesses, recorded confessions following signed Miranda warnings, and corroborating physical evidence. See Gilmore, 661 S.W.2d at 522; McDonald, 661 S.W.2d at 500; Stokes, 638 S.W.2d at 718-19; Blair, 638 S.W.2d at 744-46.

(citing <u>State v. Gilmore</u>, 661 S.W.2d 519 (Mo. 1983); <u>State v. McDonald</u>, 661 S.W.2d 497 (Mo. 1983); <u>State v. Stokes</u>, 638 S.W.2d 715 (Mo. 1982); <u>State v. Blair</u>, 638 S.W.2d 739 (Mo. 1982)).  Most

significantly, only one of the four cases concerned a contract killing. See Blair, 638 S.W.2d at 743-46.

The Missouri Supreme Court's data base omitted at least four life imprisonment cases strikingly similar to Bannister's. See State v. White, 621 S.W.2d 287 (Mo. 1981); State v. Chandler, 605 S.W.2d 100 (Mo. 1980); State v. Garrett, 595 S.W.2d 422 (Mo. 1980); State v. Flowers, 592 S.W.2d 167 (Mo. 1979). First, these cases are more similar to Bannister's than the four used by the state supreme court because these omitted cases concern contract killings. See White, 621 S.W.2d at 289; Chandler, 605 S.W.2d at 105; Garrett, 595 S.W.2d at 426; Flowers, 592 S.W.2d at 168. The state supreme court's failure to consider these similar cases negates any claim that it considered similar cases "as a whole." Second, comparison of Bannister's case to the omitted cases reveals the apparent disproportionality of Bannister's death sentence.[21]

Furthermore, when considering all eight cases as a whole, the

_____

[21]In State v. White, 621 S.W.2d 287 (Mo. 1981), a man hired the defendant to kill the man's wife. After attempting to kill the woman by shooting her in the neck and beating her, the defendant "entered [her] house, went to [her] bedroom, bound and sexually ravished her and then killed her by cutting her throat from ear to ear and the back of her neck, nearly severing her head from her body." Id. at 289-90. Evidence included the murder weapon recovered from the defendant, physical evidence from the crime scene, co-conspirators' testimony, and the victim's description of the defendant given to the police after the first attempt on her life. Id. at 291, 293-95.

In State v. Chandler, 605 S.W.2d 100 (Mo. 1980), the defendant stalked the victim for several days eventually confronting the victim in his office and robbing him. The defendant's videotaped confession and testimony before the grand jury detailed the victim's pleas for mercy and the defendant's callousness and brutality. See id. at 101, 106-07 & n.1.

In State v. Garrett, 595 S.W.2d 422, 425-26 (Mo. 1980), and State v. Flowers, 592 S.W.2d 167, 168 (Mo. 1979), the defendants attacked and struggled with the victim in his home, dragged him to the road, handcuffed him and shot him in the head three times. Evidence included recorded and videotaped confessions.

-45-

disproportionality of Bannister's death sentence becomes more troubling. Thus, if the data base had included these life imprisonment cases, the state supreme court should have recognized the disproportionality of Bannister's sentence. Omission of these cases from the data base rendered the State's proportionality review an arbitrary exercise and a denial of Bannister's rights.

## IV. Conclusion

The eyes of the world are fixed on this case. The briefs of amici curiae filed by The Lyon (France) Bar Association Commission for the Defense of Human Rights, Maastricht Centre for Human Rights and the International Centre for Criminal Law and Human Rights, as well as Steven Trombley's documentary file about Bannister attest to the international and national attention to this case. Consequently, this case will serve as a window through which others will judge the merits of the judicial system in the State of Missouri and federal civil review by petition for writ of habeas corpus.

Several of Bannister's allegations go to the heart of our perceptions of fundamental fairness in the criminal justice system: the right to be free from governmental interrogation after receiving appointed counsel, Michigan v. Jackson, 475 U.S. 625 (1986); the right to a competent attorney during trial, Strickland v. Washington, 466 U.S. 214 (1988); Powell v. Alabama, 287 U.S. 45 (1932); and the right to a competent attorney during sentencing, Mempa v. Rhay, 389 U.S. 128 (1967); Townsend v. Burke, 334 U.S. 736 (1948). As discussed in the majority's opinion, procedural barriers prevent this court from addressing several of Bannister's claims. These roadblocks, I emphasize, are procedural and in no way reflect on the merits of Bannister's claims. If these issues remain unaddressed, Missouri may execute a man without offering him a fair trial or competent legal representation. Because this court cannot address those issues on their merits, we must rely on other

authorities--either the United States Supreme Court or, if not, the Governor of Missouri--to review the record and address Bannister's contentions.

Notwithstanding bars to federal review by this court of certain claims by Bannister mentioned in the preceding paragraph, I believe this federal court should declare that any execution must await a fair proportionality of sentence review by Missouri courts. Accordingly, I would remand this case to the district court to grant appropriate relief, unless and until within a reasonable time Bannister is afforded a proportionality review of his sentence by the Missouri Supreme Court using a full data base.

A true copy.

        Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.