**Thomas Henry BATTLE, Appellant,**

v.

**Paul K. DELO, Appellee.**

No. 93–1852.

United States Court of Appeals, Eighth Circuit.

Submitted April 20, 1995.

Decided Aug. 21, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 2, 1995.*

---

* McMillian, Circuit Judge, would grant the suggestion for rehearing en banc.

Richard A. Ahrens, St. Louis, MO, argued (Robert J. Golterman, St. Louis, MO, on the brief), for appellant.

Stacy Louise Anderson, Asst. Atty. Gen., Jefferson City, MO, argued (Millie Aulbur, Asst. Atty. Gen., Jefferson City, MO, on the brief), for appellee.

Before BEAM, Circuit Judge, FLOYD R. GIBSON and JOHN R. GIBSON, Senior Circuit Judges.

BEAM, Circuit Judge.

Thomas Henry Battle petitions for reconsideration of our opinion affirming the district court's [1] denial of habeas corpus relief. *Battle v. Delo,* 19 F.3d 1547 (8th Cir.1994) (*Battle I* ). In part, Battle's petition is based upon our application of *Sawyer v. Whitley,* 112 S.Ct. 2514, 505 U.S. 333, 120 L.Ed.2d 269 (1992), to the procedural default of several of his claims of ineffective assistance of trial counsel. In *Battle I,* after finding no cause or prejudice, we applied *Sawyer* to find that Battle had not shown by " 'clear and convincing evidence' that but for the claimed constitutional error, no reasonable juror would find him [guilty]." *Battle I,* 19 F.3d at 1554. We therefore held that his default was not excused.

After our decision, the Supreme Court granted certiorari on the question of whether the *Sawyer* standard, originally articulated to demarcate the habeas "actual innocence" gateway in situations of procedurally defaulted death-penalty sentencing errors, delineated the "actual innocence" gateway for consideration of procedurally defaulted guilt-phase claims. *See Schlup v. Delo,* —— U.S. ——, ——, 115 S.Ct. 851, 854, 130 L.Ed.2d 808 (1995). We stayed our mandate to have the benefit of *Schlup* when considering Battle's attempt to pass through the guilt-phase "actual innocence" gateway. After *Schlup* clarified the appropriate standard, we requested

---

**1.** The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

supplementary briefing on Battle's claim of gateway innocence and granted a rehearing limited to that issue. Having heard Battle's argument and applied the dictates of *Schlup* to the record of the case before us, we now reaffirm the result of our earlier opinion.

## I. BACKGROUND

Battle was convicted and sentenced to death for the rape and murder of Ms. Birdie Johnson, an eighty-year-old woman who was a family acquaintance and long-time neighbor. At the time of the crime, Battle was eighteen years old. Although Battle's school attendance was erratic after the eighth grade,[2] he is an articulate and literate person who speaks and writes very well. Ms. Johnson, according to Battle, was also a bright and friendly person who called him "sweetboy." Up until the time of the crime, Battle lived in his parents' basement, next door to Ms. Johnson. He occasionally helped his parents with their business and Ms. Johnson with odd jobs. In the early morning hours of July 5, 1980, that relatively peaceful state of community was shattered when Battle destroyed Ms. Johnson's and, ultimately, his own life.

Because of the evidentiary balancing inherent in determining whether a habeas petitioner has made a sufficient showing of factual innocence to lift a procedural bar, we recite the available evidence in some detail.

On the morning of July 5, 1980, Ms. Johnson was found in her foyer, naked, ravished, and beaten, yet still conscious, alert and trying to summon help. She had multiple stab wounds, bruises, crushed bones, and a butcher knife protruding from her eyesocket. She died shortly afterwards.

Several days later, police received a tip that an Elroy Preston might be involved in the murder. Preston was picked up for questioning. Neither his fingerprints nor shoe prints matched those from the crime scene. Preston told police that he had been drinking with Battle and a Tracy Rowan that night, and had then gone to a party. The officers sought Battle to confirm Preston's alibi. The next day, Battle contacted the officers in response to a message left with his mother, and agreed to see them.

The interview began at the station at about ten-thirty A.M. During that interview, the officers noticed that Battle seemed unduly distraught for someone not suspected of any crime. When Battle slouched down in his chair, the sergeant-in-charge noticed that Battle's shoes seemed to match a shoe print lifted from the crime scene. The interview was halted and Battle was given his Miranda rights. He gave written and oral permission for his shoe and palm prints to be taken and compared with those obtained from Ms. Johnson's home at the perpetrators' point of entry and exit. Both the shoe and palm prints matched.

By two-thirty that afternoon, Battle had given three successive recorded statements in which he became progressively more candid about the murder of Ms. Johnson.[3] According to Battle, he and his "nephew," Tracy Rowan, committed the crime at the end of a night spent drinking and partying.[4] Battle described how he and Rowan entered Ms. Johnson's apartment to commit a burglary. They picked up a butcher knife on their way in through the kitchen although they knew the occupant was elderly and lived alone. Battle said Rowan then raped Ms. Johnson (while Battle himself engaged in an ever-shifting variety of activities). Battle told how and where they searched for valuables, and how they decided that they must kill Ms. Johnson when a light was turned on and their identities were revealed. He related how they each attempted to fatally stab Ms. Johnson, but were initially unsuccessful because the knife kept bending. Battle mentioned that Ms. Johnson nearly escaped out

---

**2.** Battle's education is somewhat of an enigma. At points in the record he claims to have no education beyond the eighth grade. At other points it appears that he has completed the tenth grade. At still another point he claims to be a high school graduate. What is clear from the record is that Battle is quite bright.

**3.** Battle moved to suppress the statements as involuntary. A lengthy suppression hearing was held at which the state more than met its burden of showing voluntariness.

**4.** Rowan is the brother of Battle's brother-in-law, but Battle refers to Rowan as his nephew.

the back door when their attention was diverted towards a renewed search for valuables, so they grabbed her and stabbed her some more. Finally, in frustration, Battle took the knife from Rowan, complaining that Rowan was simply torturing Ms. Johnson, and plunged it into her eyesocket. After that, Battle could continue no longer and fled, though he knew Ms. Johnson was not yet dead because she was crawling on her knees towards her front door saying "little short prayers." Battle also told police that he did not know what Rowan would tell them about the crime "because we haven't even got our story together."

In addition to the confessions, the shoe print and the palm print, the evidence presented at trial included serology evidence that linked Battle to the scene. Human sperm with A and B antigens were found in Ms. Johnson. A separate sperm stain was found on her sheets, which contained only B antigen. Battle is a B secretor, and therefore a possible source of the stain containing the B antigen.[5]

By all accounts, Battle, Rowan, and Preston had been drinking together at Preston's on July 4th, the evening preceding the crime. At trial, Battle testified that Preston, who lived nine houses from the Battles, coerced him into participating in the burglary. Battle owed Preston $15 to $35 for a chess board broken during one of their chess games and Preston wanted his money that night. Preston knew that Ms. Johnson would have recently received her benefit check. Battle said he had no choice but to go to Ms. Johnson's with Preston or take a beating. Battle argued that Preston or Rowan committed the rape and murder after he had fled

the scene.[6] Although initially excluded as inadmissible evidence, Battle had previously exonerated Preston from any involvement in Ms. Johnson's murder. This information came in on Battle's cross-examination.[7]

Battle also presented evidence that Preston was known as a bully in the neighborhood and that Preston, when jailed several months later on unrelated capital charges, came to Battle's cell and asked that Battle take "the case" for him. Preston became angry when Battle refused and an argument ensued. It was unclear to which "case" Preston was referring, although at no time was Preston charged in the murder of Ms. Johnson.

## II. DISCUSSION

■ Our reconsideration of Battle's claim of gateway innocence is not analytically complex. In the absence of a showing of cause and prejudice, federal courts may not consider a habeas petitioner's claims of constitutional error unless that petitioner has properly presented and preserved those claims in state court. See, e.g., Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, if a petitioner presents new evidence of innocence so persuasive that we cannot have confidence in his conviction unless we are also convinced that his trial was free of non-harmless constitutional error, he may pass through the "actual innocence" gateway to the procedural bar and present the merits of his otherwise defaulted claims. Schlup, —— U.S. at ——, 115 S.Ct. at 861. Battle attempts to pass through this gateway in order

---

5. Rowan is an A secretor, and so a possible source of the A antigen.

6. During their initial contact with police, Rowan and Battle each asserted that he had fled before the murder was committed by the other. When questioned as to Preston's involvement, both exonerated him. It was not until seven months after Battle's confession, after his counsel had withdrawn and new counsel had been appointed, and after Preston had been arrested on unrelated capital charges, that Battle put forth the theory that Preston had bullied him into participating, and that he subsequently fled while either Preston or Rowan committed the murder.

7. Other evidence available to us (as arguably erroneously excluded at trial, see infra at 352) includes Battle's spontaneous statements to police, the day after his arrest, that he had made a phone call to God and that God had told him to get himself straight. During the same excluded interaction, Battle told police that his "nephew" was not involved and that he alone had gone to Ms. Johnson's to look for money. He complained bitterly that Ms. Johnson need not have called him "sweetboy," because he wasn't "no sweetboy."

that we may consider the merits of his procedurally defaulted claims of ineffective assistance of counsel.

■ To determine whether Battle falls into the "rare" and "extraordinary" set of habeas petitioners in default able to overcome the "strong" and usually "conclusive presumption of guilt" which attaches after a trial and conviction, we must be persuaded that, in view of all the evidence, "it is more likely than not that no reasonable juror [8] would have found [Battle] guilty beyond a reasonable doubt." *Schlup,* —— U.S. at ——, —— n. 42, ——, 115 S.Ct. at 864, 866 n. 42, 867. To make our determination, we consider all relevant evidence: that presented at trial; that arguably wrongly excluded from trial; and that unavailable at trial. *Id.* at ——, 115 S.Ct. at 867. If new evidence calls the credibility of certain witnesses into question, and their credibility figures reasonably in our assessment, remand for an evidentiary hearing may be appropriate. *See id.* at ——, 115 S.Ct. at 868. However, the mere fact that affidavits are presented does not automatically require such a remand.[9] *Jones v. Delo,* 56 F.3d 878, 883 (8th Cir.1995); *Washington v. Delo,* 51 F.3d 756, 761 (8th Cir1995); *Barrington v. Norris,* 49 F.3d 440, 441 (8th Cir.1995).

## A. New evidence presented

■ Battle presents as new evidence an affidavit by Charles Hall, the tipster who originally turned police suspicion to Preston. According to the affidavit, Hall watched a group of people, including Battle and Preston, drinking in the street in front of his house during the early morning hours of the date of the murder. He also states that his stepson, Julius Henderson, woke him early that same morning to inform him that Battle, Preston, and Rowan were breaking into Ms. Johnson's home. Hall learned later that Ms. Johnson had been murdered. Finally, he avers that he heard Preston threaten Pearl

Thompson about one week after the murder, telling her he would "do to [her] what [he] done to that old lady."

When Hall initially contacted police with his tip, he related the alleged incident with Pearl Thompson. After police questioned Preston, a woman, purportedly Thompson, called police to report that whoever reported the threat was lying. When queried as to why anyone would make it up, she replied that Preston was disliked and that many people would like to harm him. Thompson is now deceased. Preston could not remember making the threat but told police he was frequently drunk and said a lot of crazy things he did not mean. After Battle confessed to the murder, police again contacted Hall and Preston. Both confirmed that Battle and Rowan had been drinking near Ms. Johnson's house on the date of the murder.

Hall's stepson, Julius Henderson, was contacted by Battle's attorneys. Henderson declined to get involved. However, according to the affidavit of Battle's counsel, Henderson related that he had seen Battle, Preston, and Rowan walking in the direction of Ms. Johnson's house. He later saw Preston walking in the opposite direction alone.

These statements must be taken in conjunction with Preston's eleventh hour confession, more than five years after Battle's conviction and sentencing. At Battle's state postconviction hearing, Preston, who was by then on death row with Battle, claimed to be the real killer. However, the state court found Preston's testimony not only to be "not credible" but to be "incredible." *Battle v. Missouri,* PCR 1459, slip op. at 9 (Cir.Ct., City of St. Louis, Apr. 10, 1987) (order denying postconviction relief). Absent a showing that the state court finding of fact was somehow deficient, *see* 28 U.S.C. § 2254(d), we are bound by that finding. We have no reason to doubt the state court's finding, and, after reviewing Preston's testimony, agree

---

8. A reasonable juror is one who is conscientious and properly instructed, and who fairly considers the evidence, giving the concept of beyond a reasonable doubt its proper scope. *Schlup,* —— U.S. at ——, 115 S.Ct. at 868. In other words, the proverbial "reasonable person" cast in the role of juror.

9. If a remand were automatic, petitioners could create an infinite habeas loop between appellate and district courts, forever forestalling execution. We are confident that the Supreme Court intended no such result.

completely. We therefore give no weight to Preston's purported confession.[10]

Even crediting the affidavits, and considering the cumulative effect of the new evidence therein,[11] we do not believe that any reasonable juror, presented with all the evidence would, more likely than not, have entertained a reasonable doubt as to Battle's guilt. For the most part, the affidavits confirm what no one disputes—that Preston was drinking in the area the night of the murder and was with Battle and Rowan. Since Preston lived in the neighborhood, knew Battle sufficiently well to engage in chess matches with him, and told police himself that he had been drinking with Battle and Rowan that evening, the affidavits contain very little that was not already before the jury.

The only items which would be at all new or probative are Hall's hearsay testimony as to Henderson's seeing Preston aiding Battle enter Ms. Johnson's home, and, perhaps, Preston's disputed threat to Pearl Thompson.[12] This information simply does not work to exonerate Battle. At best, it incriminates Preston, thus lending tangential support to Battle's version of the facts. *See Allen v. Nix,* 55 F.3d 414, 417 (8th Cir.1995) (evidence indirectly supporting petitioner's version of facts insufficient to establish actual innocence). It does nothing to detract from the physical evidence placing Battle at the scene, from the placement of the prints suggesting that Battle was the last to leave, or from Battle's vivid and detailed confession, which was corroborated by the state of the crime scene.

Even assuming Battle's trial was not error free, tangential evidence raising the faintest shadow of doubt as to whether Preston was along that night is not the "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" which destroys our confidence in the outcome of the trial. *Schlup,* —— U.S. at ——, 115 S.Ct. at 865. It is certainly not so strong that adding it to Battle's confession, belated retraction thereof, and the physical evidence, would more likely than not create a reasonable doubt in the mind of any reasonable juror as to *Battle's* actions against Ms. Johnson.[13]

### B. New Evidence not presented

Battle requests that we remand to the district court for an evidentiary hearing to enable him to develop serology evidence which, he claims, will exonerate him or at least show that his counsel was ineffective for not hiring an expert to attack the State's serology evidence. This claim really has two prongs, that of ineffective assistance and that of "actual innocence."

Although the ineffective assistance prong is procedurally barred, it is not as if it were never addressed on the merits. The bar arises from Battle's abandonment of that claim in his appeal of his postconviction motion. At the motion hearing, Battle argued that his counsel was ineffective for not hiring an expert to counter the State's serologist, or

---

**10.** Preston's testimony was extremely vague, even with leading questions. He appeared to have learned what he knew from his own attorney's attempt to persuade him not to testify. Preston claimed not to have come forward sooner because Battle owed him $35, which debt he had finally paid through six years of confinement.

**11.** As explained in *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), courts determining the impact of evidence unavailable at trial must evaluate the new items of evidence individually, but must make their final decision based on the likely cumulative effect of that evidence had it been presented at trial.

**12.** Henderson's statement to Battle's attorney that he saw the three together that night, and later saw Preston alone neither helps nor harms Battle, as it is consistent with either version of events.

**13.** As the cases state, a reasonable doubt is more than that arising from a mere possibility, bare imagination, or conjecture, but a real doubt preventing a reasonable person from being firmly convinced, or from having an abiding conviction of the truth of a charge. *Victor v. Nebraska,* —— U.S. ——, ——— ——, 114 S.Ct. 1239, 1245–1253, 127 L.Ed.2d 583 (1994). Often, a reasonable doubt is analogized with that uncertainty to predicate facts which would cause a reasonable person to hesitate to act on those facts. *Id.* at ——— ——, 114 S.Ct. at 1249–50. Proof beyond a reasonable doubt does not, however, require absolute certainty. *Id.* at ——, ——— ——, ——, 114 S.Ct. at 1244, 1249–50, 1255.

to prepare for cross-examination of the serologist. Battle's counsel explained, however, that while he did not hire a serologist, he did consult with one in order to determine the weaknesses of the State's presentation. From his consultation, counsel determined that the serology evidence was not vulnerable to attack, except for the statistical fact that B secretors make up 7.7% of the United States population. That translates into the real world fact that millions of other people besides Battle are B secretors. Counsel brought this fact out on cross-examination.

The motion court ruled that counsel had adequately prepared for the serology evidence and that, under the circumstances, it was not ineffective assistance to forego engaging an expert. Battle chose not to attack the motion court's finding on appeal, most probably because it was shown to be meritless. Thus he abandoned it. Battle now attempts to revive the barred serology claim through the backdoor of "new evidence." Nothing, however, prevented Battle from developing the desired serology evidence at his postconviction hearing in the Missouri state court or from developing it before now, except, perhaps, his knowledge that the serology evidence would ultimately be fatal to his professed innocence.[14] In fact, at his postconviction hearing Battle argued that his trial counsel was ineffective for failing to have Preston's blood tested.[15] It was then that he should have developed his serology evidence, if he thought it would be helpful to him.

Even if an evidentiary hearing was necessary for Battle to develop and present the serology evidence, he has not shown the cause and prejudice, or fundamental miscarriage of justice, necessary to excuse his failure to develop this evidence in state court.

*Keeney v. Tamayo–Reyes,* 504 U.S. 1, 8–12, 112 S.Ct. 1715, 1719–21, 118 L.Ed.2d 318 (1992); *Jones,* 56 F.3d at 884. In essence, Battle is asking us to excuse his evidentiary default as to his claim of actual innocence, through the actual innocence exception, in order that he may develop sufficient evidence of his actual innocence. This circular argument is without merit.

■■■■ More fundamentally, a remand is inappropriate because the "actual innocence" gateway through a procedural bar is not intended to provide a petitioner with a new trial, with all the attendant development of evidence, in hopes of a different result. *Washington,* 51 F.3d at 761–62. Rather it is an opportunity for a petitioner, aggrieved by an allegedly defective trial and having inexcusably defaulted the available remedies, to raise such a strong doubt to his guilt that, in hindsight, we cannot have confidence in the trial's outcome unless it was indeed free of harmless error. To avail himself of that opportunity, it is the petitioner's, not the court's, burden to *support* his allegations of "actual innocence" by *presenting* "new reliable evidence" of his innocence. *Schlup,* —— U.S. at ——, 115 S.Ct. at 865.

■■■■ Although adequate considering and weighing, or even perfecting, of the new evidence which a petitioner brings to a habeas court in support of his claim of gateway innocence may indeed require an evidentiary hearing, it is not the habeas court's role to uncover such evidence ab initio. The "actual innocence" gateway is there to avoid fundamental miscarriages of justice, not to provide the opportunity for fishing expeditions and delay or, as Battle seems to desire, a second trial.[16] Battle has shown no cause and preju-

---

**14.** If Preston turned out to be a B secretor, it would not exculpate Battle, also a B secretor. However, if Preston turned out not to be a B secretor, Battle's tenuous argument becomes no argument at all.

**15.** At the postconviction hearing, Battle's trial counsel explained that he did not have Preston tested for strategic reasons. Counsel felt it would be very damaging to Battle's theory of the case if the test showed Preston not to be a B secretor, and not decisive either way if Preston proved to be a B secretor. Counsel thought it the wiser course to argue the unknown. Battle

preserved his ineffective assistance claim as to that strategic decision and lost on the merits. *Battle,* 19 F.3d at 1556–57.

**16.** Battle also makes a naked request for a remand with instructions for the district court to order DNA testing. However, Battle has made no showing as to why the federal courts should intervene and provide such testing. We can only consider such an unsupported request as an additional attempt to turn his habeas petition into a second trial, and to delay the end of his federal habeas litigation.

dice for his failure to develop this evidence in state court, nor he has met his burden of production under the actual innocence exception. We therefore deny his request for a remand for an evidentiary hearing to explore and develop new serology evidence.

## III. CONCLUSION

After reconsidering Battle's claim of "actual innocence," we find that he has failed to raise sufficient doubt about his guilt to excuse his procedural default of his underlying constitutional claims. Accordingly, we deny his request for remand for an evidentiary hearing, and we affirm the result of our original decision as amended by this opinion.