**Brent Anthony RICHTER, Petitioner,**

v.

**Ron BARTEE, et al., Respondents.**

**No. 4:95CV3309.**

United States District Court,
D. Nebraska.

Sept. 2, 1997.

J. Kirk Brown, Donald B. Sternberg, Atty. Generals Office, Lincoln, NE, for Respondents.

Lyle J.Koenig, Paula B.Hutchinson, Elizabeth A. Govaerts, Lincoln, NE, for Petitioner.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's order (filing 52) finding that Petitioner has offered new reliable evidence, not presented at trial, demonstrating that he is actually innocent of the crime for which he has been convicted and Respondents' appeal from that order (filing 55), filed as allowed by 28 U.S.C. § 636(b)(1)(A) and NELR 72.3.

The court has conducted, pursuant to 28 U.S.C. § 636(b)(1)(A) and NELR 72.3, a review[1] of the portions of the order to which objections have been made and finds that the objections to the order shall be denied for the reason that the Magistrate Judge's order is not clearly erroneous or contrary to law.

With regard to the respondents' specific objections to the Magistrate Judge's order, we conclude that (1) there is no rationale to support limiting the actual innocence exception to cases in which the petitioner is no longer incarcerated when we have previously determined that the court has jurisdiction over Petitioner's 28 U.S.C. § 2254 motion[2]; (2) the standard set forth in *Schlup v. Delo*, 513 U.S. 298, 326–27, 115 S.Ct. 851, 866–67, 130 L.Ed.2d 808 (1995), applies to cases in which the petitioner has not been sentenced to death[3], and even if *Schlup* did not apply

---

1. To the extent the appropriate standard of review is de novo, I have conducted a de novo review.

2. See Filings 17 & 21 (adoption of Report and Recommendation recommending denial of Respondents' motion to dismiss for lack of subject matter jurisdiction because although Petitioner was unconditionally released from physical cus-

tody one day after his petition for habeas corpus was filed, he still faces collateral consequences from his conviction).

3. *See Weeks v. Bowersox*, 119 F.3d 1342, 1350–51 (8th Cir.1997) (en banc) (*Schlup* actual innocence standard applied in case where petitioner sentenced to concurrent terms of 30 years and life imprisonment); *Whitmore v. Avery*, 63 F.3d

outside the death penalty context, we agree with Magistrate Judge Piester that the evidence adduced at the evidentiary hearing would meet the standard set forth in *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); and (3) Petitioner met his burden by offering new evidence showing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," *Schlup*, 513 U.S. at 327, 115 S.Ct. at 867.

Because we are not persuaded by the arguments presented in Respondent's appeal, we shall deny the appeal.

IT IS ORDERED:

1. The Magistrate Judge's order (filing 52) shall not be disturbed and is hereby sustained;

2. The respondents' appeal of the Magistrate Judge's order (filing 55) is denied; and

3. As stated in Filing 63, Respondents are granted 30 days from the date of this order to respond to Petitioner's motion for summary judgment (filing 56).

## MEMORANDUM AND ORDER

PIESTER, United States Magistrate Judge.

In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court held that a habeas petitioner, in seeking to overcome a procedural default for which cause and prejudice have not been shown, must meet the "fundamental miscarriage of justice" exception of *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), before a federal court may consider his underlying constitutional claims. In order to do so, the petitioner must offer new reliable evidence, not presented at trial, demonstrating that he is "actually innocent" of the crime for which he has been convicted. *Schlup*, 513 U.S. at 322–24, 115 S.Ct. at 865. In this case Petitioner Brent Anthony Richter has asked the court to find he has met that exacting standard. After reviewing the extensive testimony and exhibits presented at the two-day evidentiary hearing in this matter, I find that, he has done so. Indeed,

if Richter's constitutional claims were not heard by this court, a fundamental miscarriage of justice would occur.

## BACKGROUND

On June 28, 1991 Denise Juve claimed to police that she was brutally beaten and raped outside the apartment of a former boyfriend, Darin Curtis. Earlier in the evening she had visited Curtis, leaving around 11:30 p.m. Half an hour later, Curtis heard someone pounding on his front door, and when he opened it, he discovered Juve, bruised and battered. (Filing 6, Ex. B at 2.)

According to Juve's testimony at trial, after she left Curtis's apartment, she walked her dog for some time before she got in her car to drive home. Once in the car Juve's dog began to whimper. She drove a short distance, parked the car in front of a grass field, and let the dog out. When Juve walked into the field to retrieve the dog, according to Juve, someone hit her on the back of the head. She awoke to find her hands tied above her head and a man on top of her. When she tried to scream, the assailant struck her on the right side of the face. According to Juve, the assailant then ripped her clothes open and penetrated her. She claimed that the assailant fled the scene when he heard a car door shut. (Filing 6, Ex. B at 2–3.) No one witnessed this attack; law enforcement officials found no physical evidence indicating that an assailant had actually been present in the area; and no semen was found in the vagina or on the clothing of the alleged victim. No tracks were found in the area, and the investigators did not attempt to hunt for an assailant with a canine unit.

After Juve returned to Curtis's apartment, she was taken to Midlands Hospital, where she received treatment for a ruptured disk in the joint of her jaw. During one of the two surgeries that followed, doctors placed a plastic joint in her jaw. While at the hospital Juve also told medical personnel that she had not had sexual relations with anyone for at least six weeks before the alleged assault.

688, 689–90 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1282, 134 L.Ed.2d 227 (1996) (*Schlup* actual innocence standard applied in

case where petitioner was sentenced to term of years for controlled substance offenses).

She described her attacker as a stocky, muscular man, six feet two inches in height, in his late twenties or early thirties. She estimated his weight between one hundred and eighty to two hundred pounds. According to Juve, he had short blonde hair and was wearing shorts and a white T-shirt. The Sarpy County Sheriff's Office made a composite sketch of the assailant from Juve's description. (Filing 6, Ex. B at 2–3.)

Two days after the assault, Sarpy County Deputy Sheriff Monty Daganaar noticed a young man at Methodist Hospital who resembled the composite drawing. Deputy Daganaar questioned the man, who had been hospitalized following an attempted suicide during the early morning hours of June 30, 1996, and determined that he lived four to five blocks from the location of the assault. Investigator Kris Yount took his photograph to the Midland's Hospital and showed it to Juve in an "array" with several others. Unlike the other men whose photographs were also in the array, the young man from the hospital's photograph was pasted onto another background. (Filing 6E, Bill of Exceptions Vol. III, Ex. 10.) When investigators presented the photographs to Juve, she hesitated two and a half minutes before responding. (Filing 5D, Bill of Exceptions Vol. I, 85:6–11.) She initially was undecided between the men in two photographs, but eventually identified the young man wearing the hospital gown, nineteen-year-old Brent Richter, as her assailant. (Id. at 86:15–24.) A few days later, Juve identified Richter, whose picture she had already observed, out of a live line-up. (Filing 6, Ex. B at 3–4.) At the time Richter stood five-feet ten-inches in height and weighed approximately one hundred and fifty pounds. (Filing 6D, Bill of Exceptions Vol. I, 213:14–214:11.)

Apart from the identification by Denise Juve, scant physical evidence links petitioner, or any other person, with the reported crime. There is no DNA evidence or blood samples matching Richter's, no hair fibers or fibers from his clothing found on the victim, in short nothing which independently verifies Juve's allegations that Richter raped her.[1]

(Id. at 174:16–183:23.) Richter maintains that on the night of the assault he was at a friend's house watching a boxing match. According to Richter, around midnight he left the party and arrived at his home at 12:15 a.m. At trial petitioner produced several witnesses that testified he did not leave the party until after midnight that night, thus rendering it impossible for him to have committed the crime. (Filing 6D, Bill of Exceptions Vol. II, 246:6–311:14.)

Despite the lack of any physical evidence, and despite the witnesses attesting to Richter's alibi, on April 9, 1992 a Sarpy County, Nebraska jury found Richter guilty of first degree forcible sexual assault and first degree assault upon Denise Juve. (Filing 3 at ¶ 1–7.) The court sentenced him to three to seven years imprisonment for the sexual assault and two years imprisonment for the physical assault, such terms to run concurrently. (Id. at 3.) The Nebraska Court of Appeals affirmed the convictions and sentences on May 24, 1993. State v. Richter, 3 Neb.C.A. 459, 1993 WL 120289 (Neb.App. 1993). However, Richter failed to present the claims relevant to this proceeding in the state courts in a motion for postconviction relief, and as a result, he is without an available means by which to do so. In addition, petitioner is unable to excuse his procedural default through "cause" and "prejudice." (See filing 27 at 6–10.) Consequently, unless Richter can meet the "fundamental miscarriage of justice" exception, his claims will be barred from federal review, and his conviction will stand.

## FUNDAMENTAL MISCARRIAGE OF JUSTICE

■ Under Schlup v. Delo, 513 U.S. 298, 314–16, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995), Richter can construct a "gateway" so that the court may consider his constitutional claims, even though those claims are barred by a procedural default, if there is "sufficient doubt about his guilt to justify the conclusion that his [conviction] would be a miscarriage of justice."[2] Id. In order to construct that

---

1. Although a half-inch long, blonde human hair was found on Juve, the hair was never positively matched to Richter and could have come from any number of sources.

2. There is no requirement that the underlying habeas claims heard under such a scenario relate to the evidence of innocence. See id.

"gateway," Richter must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" unless "the trial was free of nonharmless constitutional error." *Id.* "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.*

The standard set forth in *Schlup* and *Carrier* is high. It requires Richter to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. "To establish the requisite probability, the petitioner must show it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup,* 513 U.S. at 327, 115 S.Ct. at 867.[3] "[T]he standard, requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329, 115 S.Ct. at 868. I convened a two-day evidentiary hearing to give the petitioner the opportunity to offer such evidence, and I now am required to make that "probabilistic determination." *Id.* Before doing so, however, I first must address two preliminary matters.

### A. Application of *Schlup* to non-capital cases

■ Respondent argues that *Schlup,* in which the habeas petitioner had been sentenced to death, does not apply at all in this instance, since this case does not involve imposition of the death penalty. He supports his argument with the following language in *Schlup:*

> The paramount importance of avoiding the injustice of *executing* one who is actually innocent thus *requires* the application of the *Carrier* standard.
>
> \*    \*    \*    \*    \*    \*
>
> Accordingly, we hold that the *Carrier* "probably resulted" standard rather than the more stringent *Sawyer* standard must govern the miscarriage of justice inquiry

when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claim.

513 U.S. at 325–27, 115 S.Ct. at 866–67 (emphasis supplied by respondent). Respondent therefore urges application of the more stringent standard of *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), which would require petitioner to show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner" guilty. *Id.* at 348, 112 S.Ct. at 2523–24. This argument fails for several reasons.

First, no authority, other than the above-quoted language, is cited for the respondent's position, and I am aware of no authority, following the *Schlup* decision, that would support it. Second, although the Anti–Terrorism and Effective Death Penalty Act distinguishes between capital and non-capital cases in some instances, I have already concluded that the Act does not apply to this case. (*See* filing 27 at 5–6.) Third, in a recent § 2255 case brought by a federal prisoner, a panel of the Eighth Circuit Court of Appeals rejected the argument that Supreme Court decisions involving claimed fundamental miscarriages of justice do not apply in non-capital cases. *Embrey v. Hershberger,* 106 F.3d 805, 807–08 & n. 2, n. 3 (8th Cir. 1997). To the contrary, the court declared, "Application of procedural default principles" do not "depend 'on the nature of the penalty imposed.'" *Id.* at 808 (quoting *Smith v. Murray,* 477 U.S. 527, 538, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986)). I therefore decline the respondent's invitation to advance such a distinction in this case.[4]

### B. What evidence may be considered?

The "new evidence" at issue here consists of several matters: (1) the testimony of Thomas L. Bennett, M.D., a forensic pathologist, that in his opinion the wounds and injuries of the victim in this incident, Denise Juve, were self inflicted; (2) the testimony of Donald Stonefeld, M.D., a psychiatrist, that

---

**3.** "The petitioner is required to make a stronger showing than that needed to establish prejudice" for purposes of·a claim of ineffective assistance of counsel. *Id.*

**4.** In any event, although it is concededly a closer call, in my opinion the evidence adduced at the evidentiary hearing held before me would meet even the more stringent test in *Sawyer.*

in his opinion the victim was, at the time of. this incident, suffering from a severe personality disorder that could cause her to misperceive events and render her incapable of distinguishing reality; (3) the testimony of Darin Curtis, a former boyfriend of Juve, that on the night of this incident he had consensual sexual intercourse with Juve; (4) petitioner's failed polygraph examination and the testimony of Charles R. Honts, Ph.D., a polygraph expert, that in his opinion the polygraph examination was incorrectly administered and scored, resulting in an erroneous conclusion that petitioner was being untruthful;[5] and (5) the evidence of "the Lenexa, Kansas incident," a disturbingly similar false-report of rape by Denise Juve a year after the reported rape in Sarpy County.

The parties disagree as to which of this evidence I may consider under the parameters of *Schlup*. Petitioner argues that I may consider any evidence, whether or not admissible at a new trial, and whether or not it existed at the time of the original trial. Respondent argues that I am limited to considering admissible evidence that would be sufficient under state law to entitle the petitioner to a new trial and that I cannot consider evidence of events that postdate the original trial. In order to permit the holding of but one evidentiary hearing, I admitted all of the evidence proffered, reserving until now my ruling on the scope of evidence to be considered.

*Schlup* itself provides some, but not definitive, guidance. Part of the opinion addresses the nature of the evidence to be considered:

> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the *Carrier* standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence

> "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The *Carrier* standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is. drawn with reference to reasonable doubt.

*Id.* at 327–28, 115 S.Ct. at 867 (footnote omitted) (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi. L.Rev. 142, 160 (1970)).

Another passage is also noteworthy. In describing the substantive character of the *Carrier* test, the Court states:

> We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him. The word "reasonable" in that formulation is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt. ·

*Id.* at 329, 115 S.Ct. at 868. It is difficult to conceive how a "reasonable juror" could consider facts that are not admissible evidence. Even if some inadmissible facts were presented to the "reasonable·juror" in error, it would seem that the "reasonable juror," in following the court's directions and instructions, would disregard them. This reasoning, however, does not square with the earlier passage from *Schlup* quoted above.

This issue has not been discussed in this circuit's decisions. In *Battle v. Delo*, 64 F.3d 347 (8th Cir.1995), the court stated that in viewing the petitioner's attempt·to overcome the " 'strong' and usually 'conclusive presumption of guilt' " which attaches after a

---

**5.** Respondent sought admission of the polygraph examination, and petitioner called Dr. Hontz to
criticize the results of that examination.

trial and conviction, "the court considers 'all relevant evidence: that presented at trial; that arguably wrongly excluded from trial; and that unavailable at trial.' If new evidence calls the credibility of certain witnesses into question, and their credibility figures reasonably in our assessment, remand for an evidentiary hearing may be appropriate." *Id.* at 352 (quoting *Schlup*). The court in *Battle* did consider, among other new evidence, "hearsay testimony." *Id.* at 353. *See also Allen v. Nix,* 55 F.3d 414, 417 (8th Cir., 1995) (newly discovered evidence of co-defendant's admissions insufficient to meet *Schlup* standard); *Washington v. Delo,* 51 F.3d 756, 761 (8th Cir.1995) ("We consider all probative evidence" in assessing claims of innocence.); *Barrington v. Norris,* 49 F.3d 440, 441 (8th Cir.1995) (affidavits considered). Because the circuit court ultimately decided that the habeas petitioners in all but one of those cases were not entitled to relief on the basis of the evidence presented, it is unclear what evidence the circuit court would have considered if the petitioner mustered reliable but inadmissible evidence that might have been met the standard of *Carrier* and *Schlup*.[6]

The question then remains as to what sort of evidence may be considered. There seem to be at least two possible resolutions: first, a district court can consider only new evidence that would arguably be admissible if the petitioner were retried, or second, a district court can consider any reliable evidence, whether admissible in a second trial or not. The distinction is an important one: can evidence of actual innocence be considered if it has some measure of reliability but would likely be excluded on retrial? *Schlup* is unclear. The opinion mentions considering evidence "wrongly excluded or to have become available only after the trial," but it also

states that district courts are not bound by "rules of evidence that would govern at trial." 513 U.S. at 326–28, 115 S.Ct. at 867. Perhaps from this language the Court meant that any reliable evidence may be considered. Fortunately, I need not explore the issue more fully in this case, because I conclude that, with one notable exception, all of the new evidence at issue in this case would be admissible at a retrial and therefore may be considered under *Schlup*.

■ Upon consideration I conclude that all but the polygraph evidence—which was originally introduced by the respondent to rebut Richter's claim—would be admissible at a new trial, and further, the polygraph examination is so unreliable that even if it were considered, it would make no difference as to the outcome of petitioner's claim.[7] As for the other evidence, the testimony of Darin Curtis is clearly relevant and probative to the 1991 assault, and the testimony of the forensic pathologist that Juve's injuries in 1991 were self-inflicted is also clearly admissible.

Respondent argues that the remainder of the new evidence should not be considered because it is based on events and information, such as the "Lenexa Incident," which postdate the conviction. That argument is without merit. Although the testimony of Dr. Stonefeld, the psychiatrist, was based to a large extent on psychological records that postdated the conviction, his ultimate opinion is that Juve's personality disorder is permanent and would have affected her ability to perceive reality in the summer of 1991 just as much as it did a year later in the false report to the Lenexa Police. Furthermore, under Nebraska law the "Lenexa Incident" itself would be admissible at a retrial of petitioner, even though the event postdates the claimed rape in Sarpy County.[8] *See*

---

6. The other case, *Battle,* was remanded for an evidentiary hearing, but the panel did not elucidate the type of evidence that ultimately could be considered as proof of the petitioner's claim.

7. This evidence is discussed in detail more fully below.

8. Respondent's argument that the psychiatrist's testimony is inadmissible misses the mark, and the cases he cites do not support his proposition. *State v. Maggard,* 1 Neb.App. 529, 502 N.W.2d 493 (1993), involved exclusion of testimony re-

garding the "profile" of a child molester, and *State v. Beermann,* 231 Neb. 380, 436 N.W.2d 499 (1989), merely holds that it is improper for a criminal investigator to vouch for the credibility of a child witness. If a victim suffers or appears to suffer from a mental condition, a psychological expert may testify about the victim's ability to process information and accurately perceive reality. *See State v. Trammell,* 231 Neb. 137, 435 N.W.2d 197 (1989); *State v. Doremus,* 2 Neb. App. 784, 514 N.W.2d 649 (1994).

*State v. Dixon*, 240 Neb. 454, 459, 482 N.W.2d 573, 577 (1992) (subsequent robbery of victim clearly relevant for purposes of attacking the reliability of the identification of first robber by the victim, but because the circumstances of the second robbery in *Dixon* were so dissimilar it would have had little probative value and would have unfairly confused the jury); *see also* John W. Strong, *McCormick on Evidence* § 185 at 773–75 (4th ed. 1992) ("A fact that is 'of consequence' is material, and evidence that affects the probability that a fact is as a party claims it to be has probative force.").

Having concluded that all of the newly presented evidence, except for the polygraph examination introduced by respondent, may be considered, I now turn to evaluating that evidence under the *Schlup/Carrier* standard.

### EVIDENCE OF "ACTUAL INNOCENCE"

Before reciting the evidence of "actual innocence" in this case, it is important to note several details from the trial. First, there is virtually no independent physical evidence that Brent Richter, or any other person, raped Denise Juve. There are no matching pubic hairs, no DNA, no blood samples, no semen samples, no hair samples,[9] no fiber samples. (Filing 6D, Bill of Exceptions Vol. I, at 174:16–183:23.)

Second, although the assault and rape allegedly occurred near a large apartment complex on a weekend night, there were no percipient witnesses corroborating Juve's report. No one observed the assault. No one observed anyone who might have been the assailant. No one witnessed suspicious activity in the area on the night in question.

Third, although Juve positively identified Richter in both a line-up and in a photo array, that identification is subject to question. When investigators presented Juve with the photo array, she hesitated two and a half minutes before responding and even then had difficulty choosing between the photograph of Richter and the photograph of another man. (Filing 6D, Bill of Exceptions Vol. I, 85:6–86:24.) Further, none of the

other men in the subsequent line-up looked anything like Juve's original description of the assailant; none other than Richter even had short blond hair. (*See id.* at Ex. 11.) Although Juve's testimony on the point is confused, it is apparent at some point of the process she was told that the police had a suspect. (*Id.* at 82:1–34:9.) I also note that the police sketch drawn after the crime resembles Richter no more than several hundred other young males with short blond hair. (*See* filing 6E, Bill of Exceptions Vol. III, Ex. 9.) Furthermore, at the time of the incident Richter was significantly shorter, thinner, and younger than the attacker Juve originally described. (Filing 6D, Bill of Exceptions Vol. I, 213:14–214:11.)

Fourth, Richter has proclaimed his innocence consistently before, during, and after trial, even when under substantial pressure by law enforcement to make a confession.

Fifth, Richter produced several witnesses who testified that at the time of the alleged rape Richter was with them at a party. (Filing 6D, Bill of Exceptions Vol. II, 246:6–311:14.)

Simply put, the only evidence that Brent Richter committed this rape, or that the victim was ever raped by anyone, derives from the victim, Denise Juve. As the following evidence reveals, her testimony is highly suspect.

#### A. Testimony of Darin Curtis and Investigator Yount

On the night of June 29, 1991, after Denise Juve reported being raped outside the apartment of Darin Curtis in Papillion, Nebraska, Investigator Kris Yount took Juve to Midlands Community Hospital in Papillion, Nebraska, to conduct a "rape kit," which consists of a pelvic exam, scraping beneath the fingernails for tissues, and combing the pubic hair and head hair of the victim. At that time Midlands medical personnel asked Juve when was the last time she had sexual intercourse. At that time Juve told authorities that she had not had intercourse since "late

---

9. Although one strand of blond hair was found on the victim's belt, there is no evidence that it matches Richter.

May of 1991." (*See* Plaintiff's Exhibit 11 at line marked "last coitus prior to assault.")

At the evidentiary hearing, petitioner called Darin Curtis, the former boyfriend of Denise Juve, to the stand. Curtis testified that on the night of the incident Juve called him and said she was visiting from out of town and wanted to see him. The two of them watched television and had consensual vaginal intercourse. Curtis testified that he did not ejaculate during this sexual act. Curtis told Investigator Yount that he had engaged in sexual intercourse with Juve, and Investigator Yount admitted during the evidentiary hearing that Curtis had, in fact, told her so in the course of her investigation of the incident. Thus, it appears that Juve lied to police and to Midlands medical personnel that she had not had sexual intercourse with anyone during the month prior to the assault. Curtis did not tell Richter's counsel that he had had sexual intercourse with Juve on the night of the alleged assault nor does it appear did the prosecution or police.

### B. Testimony of Lenexa Police Officers

In August 1992, thirteen months after the incident at issue here and approximately four and one-half months after the trial, Denise Juve had moved to Lenexa, Kansas. On the evening of August 31, 1992, she visited her then boyfriend, Todd Freeman, at his apartment. Juve asked Freeman to go to a nearby store and purchase some medication for her. When he returned, Juve had sustained multiple scratches to her arms and legs, a bruised right cheek, and a broken right jaw. She claimed she had been raped and assaulted by an unknown assailant. Lenexa Police Officers Rick Dougan and David Ogilvie testified at the evidentiary hearing about what they determined to be a false report.

After Juve sent Freeman from the apartment on an errand, Juve reported that her dog began to whimper. She let the dog out of the apartment to urinate, and it ran across the street into an open field. Juve claimed that she followed the dog into the field to fetch it and was hit from behind. The assailant held an object to her back, forced her farther into the grass, tied her hands, and sexually assaulted her. He also punched her in the face. She sustained the following injuries: a swollen mouth, a swollen black right eye, scratches on her arms and legs, and an injured right jaw. According to Juve, the assailant, a five-foot ten-inch white, "skinny" male with long blond hair, left without ejaculating.

Lenexa police officers were called and investigated the alleged rape. Within a short amount of time, they began to suspect Juve had made a false report. The officers were never able to identify a "crime scene." They found no physical evidence that an assailant had been in the area: no tracks, no matted grass, no footprints, no traces of sweat or blood consistent with a struggle. Moreover, a canine unit was unable to detect the presence of anyone else in the area other than Juve. No physical evidence of a rape existed: no semen, no blood, no pubic hair, no head hair, no clothing fibers. Based on their experience the officers determined Juve's story simply "didn't add up." No suspect was ever found.

Further investigation confirmed the officers' suspicion that Juve had fabricated her allegations of rape. Although she claimed she had screamed when the suspect initially grabbed her, no one in the area heard her do so, and no one heard her dog bark. In addition, no one in the area saw anything suspicious or out of the ordinary. The police then obtained the information about the reported rape in Sarpy County, Nebraska and noted the disturbingly similar pattern between Juve's stories.

After Juve recovered from her injuries, she returned to work and eventually complained to police that someone had called for her but hung up without saying anything. The police traced the line and asked Juve's employer not to tell Juve that they had done so. After the line was tapped, on a day when Juve was not working, Juve's co-workers received a "hang-up" call. Despite admonitions directing them not to do so, Juve's co-workers told her of the trace on the line. No further "hang-up" calls were received after Juve learned of the trace.

On October 2, 1992 Sgt. David Ogilvie interviewed Juve at the Lenexa Police Station. He videotaped the interview, without Juve's knowledge, so that he might obtain a confession from Juve that she had fabricated the report. If Juve confessed, Ogilvie planned to

ask the county prosecutor to press charges against her for filing a false report. During the interview Sgt. Ogilvie asked Juve why the police could not find a "crime scene." Juve then changed her story, stating that the actual struggle had occurred in the street, not in the grass as she had earlier claimed. (Hearing Testimony; Plaintiff's Ex. 1E, "Synopsis of Video Interview.") At one point during the interview, Sgt. Ogilvie left the room as Juve was crying hard. He immediately went to check the monitor. By the time he reached it, Juve had stopped crying "completely." He watched Juve grab his hand-written notes, try to read them, and then push them away. When Ogilvie entered the room, Juve had started crying again. Sgt. Ogilvie told Juve he believed she had made a false report. Within a few days of the interview, Juve had checked herself into "The Kansas Institute," seeking treatment for mental illness.

### C. Testimony of Donald Stonefeld, M.D.

Denise Juve has an extensive record of serious mental illness. Because of her condition, she has been hospitalized several times, in Nebraska, Iowa, and Kansas, both before and after the alleged assault by Brent Richter. In addition to the incidents in Sarpy County, Nebraska and Lenexa, Kansas, she also claims to have been raped in Mankato, Minnesota. Like the Lenexa Incident, no suspect was ever found in the Mankato case.[10] Juve has also tried to commit suicide on several occasions, including shortly before the alleged rape in Sarpy County.

Donald Stonefeld, M.D., a neurologist and psychiatrist, testified that he had studied the records of this case, Lenexa Police Department records and video tape from the "Lenexa, Kansas incident," together with the voluminous psychiatric medical records of

Denise Juve.[11] In his opinion Denise Juve suffers from a "borderline personality disorder" as described in the *Diagnostic and Statistical Manual of the American Psychiatric Association* (4th Ed.) (hereinafter "DSM IV"). According to Dr. Stonefeld, one must meet only five of nine criteria to be classified with the untreatable disorder. Stonefeld determined that Denise Juve met all nine.[12]

Dr. Stonefeld explained in detail the behavior that led him to classify Juve as suffering from "borderline personality disorder" and stated that the disorder is either a genetic disposition or develops early in childhood. While it is always present, it sometimes manifests itself in stronger ways than at other times. The disorder is so serious that for many years experts included it among the schizophrenias. A person with borderline personality disorder often misperceives events as they happen or so twists them in the mind as to truly believe certain things did or did not happen, as suits the individual's need to avoid the anxiety involved in taking personal responsibility for her actions. Thus, Dr. Stonefeld testified that a person with this sort of personality disorder cannot be trusted to accurately report factual events in which she is personally involved, particularly if the behavior itself may be subject to question. According to Dr. Stonefeld, in the mind of a person with this disorder, an act of consensual sex with one person can easily be distorted into "rape" by a totally different person. In comparison with reality as a normal person would perceive it, the person's perceptions are "Alice In Wonderland."

While Dr. Stonefeld's testimony does not carry as much weight as it might had he personally examined Juve, his opinion does

---

10. The factual allegations of the sexual assault in Mankato are dissimilar to Lenexa and Sarpy County, and need not be repeated here.

11. Dr. Stonefeld did not personally test or interview Juve; however, her whereabouts are unknown to all parties at this time. In addition, he testified that experts in the field often rely upon the reports of other experts in making "postmortem" diagnoses. Dr. Stonefeld did not personally communicate with the treating psychiatrists for fear it would taint his analysis, nor with any other mental health providers.

12. These criteria are (1) extreme efforts to avoid abandonment, either actual or imagined; (2) a pattern of unstable, "love-hate" relationships; (3) identity disturbance/ unstable self-image; (4) impulsivity that is potentially self-damaging; (5) self-mutilating behavior; (6) affected instability/episodic mood swings; (7) chronic feelings of emptiness; (8) difficulty controlling anger; and (9) transient stress-related paranoid suspicious ideations.

have support in Juve's extensive history of mental instability. Further, another psychiatrist who treated Juve while she was hospitalized at the Kansas Institute had also come to recognize that Juve might suffer from a "mixed personality disorder not otherwise specified" under the version of the DSM at the time she was treated.[13] The evidence of Juve's mental condition, even if viewed with abundant caution, raises very significant issues about Juve's ability to perceive and relate the truth.

### D. Testimony of Thomas L. Bennett, M.D.

Thomas L. Bennett, M.D., a forensic pathologist from Des Moines, Iowa examined the records and photographs concerning Denise Juve's injuries from the Sarpy County Incident, the Lenexa Incident, and the Mankato Incident, as well as records of various surgical procedures and treatments she underwent for other injuries. In his opinion the injuries from each of the instances of claimed rape were self-inflicted. Dr. Bennett noted that her injuries were in fact very mild in comparison to the trauma she claimed to have undergone. The scratches were superficial, and the bruises around her eye socket were in an area where bruises spread quite easily. (*See generally* exs. 6–12 and photographs C1–22.) Further, in none of the instances did Juve exhibit redness around her vagina consistent with forced penetration.

Although Juve claimed that her hands were tied in both the Sarpy County and Lenexa Incidents, Dr. Bennett opined that she caused the injuries herself in an attempt to appear that she had been bound. Juve's scratches appeared on the fleshy part of the forearm, but if she had actually been bound, the bindings would have gathered around the narrowest part of the arm, the wrist. Further, the area would have exhibited "pressure marks" where the blood vessels popped, not superficial scratches.

Moreover, the direction of the scratches on Juve's forearms and legs started towards her feet and moved up toward her body. They ran roughly parallel to each other [14] and were of uniform depth, indicating they were caused by a human hand. While a person can easily cause such marks by pulling the fingernails toward the center of the body, it is very unlikely that scratches from an assailant would run up toward the center of the body. In contrast, the scratches on Juve's shoulders ran downward, consistent with moving the opposite arm across the body and pulling with the fingers down and in toward the body's center. Dr. Bennett also noted that the scratches on Juve's forearms and legs ran different directions than those on the shoulders. Furthermore, all of Juve's injuries occurred in areas that were easily accessible to her, and some appeared in places inconsistent with her allegations, such as scratches that do not match the area where Juve claimed her shorts were ripped.

Dr. Bennett further testified that Juve's right mandibular joint had been injured on several occasions and that Juve could easily injure that joint herself. He explained that the mandibular bone is spongy and the outer shell of the bone is very thin. In addition, although Juve claimed that her jaw had been broken in both Sarpy County and Lenexa, it had actually been fractured only once. Thus, Juve's assessment of her own injuries exaggerated their actual extent. Dr. Bennett also noted that Juve's abdomen was crisscrossed with "railroad tracks," scars from multiple elective surgeries. Persons who exhibit "tracks" often seek medical attention for vague complaints and often injure themselves to gain attention.

13. "Borderline personality disorder" did not appear as a separate entry in the DSM until publication of the fourth edition, now presently in use by clinical psychiatrists. At the time of Juve's hospitalization in Kansas, the DSM IV had not yet been published. Although other persons who treated Juve before that time had not diagnosed her as suffering from a personality disorder, Dr. Stonefeld testified that the diagnosis can only be made by observing the pattern of behavior of the subject over several years. He testified that from the medical records it appears that the psychiatrist in Kansas had begun to suspect Juve suffered from an untreatable personality disorder, but Juve left the hospital on her own accord before the diagnosis could be confirmed.

14. According to Dr. Bennett, in most instances the fingers spread slightly as they move across the skin, showing the direction of the scratch. Juve's scratches were consistent with this pattern.

Dr. Bennett concluded to a reasonable degree of medical certainty that Juve's injuries from the Sarpy County incident were self-inflicted, as well as those in Lenexa and Mankato. Dr. Bennett further opined that when all three rape incidents are viewed together, each separate conclusion of self-infliction becomes even stronger, because persons who inflict injuries upon themselves do so repeatedly. The separate occurrences in this case form such a pattern of self-infliction.

Dr. Bennett's testimony was thorough, authoritative, and persuasive, and I accord it substantial weight.

### E. The Polygraph Examinations

In order to rebut Richter's evidence of actual innocence, the respondent adduced testimony from Kenneth Benck of the Sarpy County, Nebraska Sheriff's Department. Benck had administered a polygraph examination to Brent Richter and one of his alibi witness and concluded that both Richter and the witness were untruthful in answering questions concerning whether Richter had raped the victim in this case. For three reasons, I give this evidence no weight. First, the polygraph examinations would not be admissible at a retrial. *State v. Allen,* 252 Neb. 187, 204, 560 N.W.2d 829, 842 (1997). Second, the jury that convicted Richter obviously discounted his testimony and that of his alibi witnesses, so the examinations add nothing to the mix. Third, petitioner adduced convincing evidence that the particular polygraphs in this case were flawed both in administration and in scoring.

Petitioner produced the testimony of Charles R. Honts, Ph.D., an Associate Professor of experimental psychology at the University of Idaho. Honts opined that the methodology used by Benck in conducting the polygraph examinations was flawed. According to Dr. Honts, Benck's control questions were weak, and his ultimate question was improperly worded. Weak control questions skew the results of the examination toward deceitfulness, because the examiner cannot obtain an accurate measure of the subject's biological responses. In addition, in Dr. Honts's opinion the ultimate question used in the examination of Richter—"Did you beat and rape that woman on Friday night, June 28, 1991?"—was improper. According

to Dr. Honts, examiners are trained never to use the word "rape" in constructing an ultimate question, because the word is so emotionally laden that it can cause an adverse biological response in an innocent person, thereby registering a "false positive."

Further, Dr. Honts testified that the validity of the examinations at issue here are dubious for other reasons. Studies have shown that when law enforcement officers conduct polygraph examinations, the results are generally unreliable because there often is a lack of trust between the subject and the examiner. Polygraphs are only reliable if the subject believes that if the truth is told, he or she will pass the exam. In addition, law enforcement officers often use the polygraph as an "interrogation tool" rather than a "forensic tool for determining credibility." For example, in this case Benck asked Richter a series of "Reed questions," questions that are asked during the examination solely as an investigative technique, not to determine the subject's credibility. Responses to those questions provide the investigator with a set of keys to be used later in the interrogation that follows the examination, in order to prompt a confession from the subject. They have no purpose as far as the examination itself is concerned. In this case Benck confronted Richter after the examination in an attempt to obtain a confession. Richter did not confess.

Finally, Dr. Honts opined that the scoring of Richter's examination was not in keeping with polygraph examination standards, and in fact, was so divergent from those standards as to have resulted in an erroneous conclusion that Richter was being untruthful. Even though the test itself was faulty, if scored properly, Honts testified, the results would have exonerated Richter.

Because polygraph evidence is inadmissible in Nebraska, *Allen, supra,* I look upon this evidence as having no significance. It was not mentioned in Richter's original trial and would not be mentioned in any subsequent retrial. Further, it appears that problems with the methodology employed by Officer Benck exist. I therefore disregard the polygraph examinations in my assessment of

the "new evidence" on the question of actual innocence.

### CONCLUSION

If this case were retried at this time, Denise Juve would have to testify as the prosecuting witness, for her testimony is the sole evidence that Richter committed the assault and rape.[15] Apart from Juve, there is virtually no evidence, physical or otherwise, that Brent Richter raped her. Upon retrial her credibility would most assuredly be attacked pursuant to *Neb.Rev.Stat.* § 27–608(2).[16] While admissibility of specific instances of conduct would be within the discretion of the trial court, it: is difficult to imagine that the "Lenexa incident" would not be aggressively explored on cross examination. If so, the credibility of Denise Juve would largely be, if not totally, destroyed. Without her testimony as a credible witness, it is inconceivable that petitioner would be convicted.

■■ My review of the evidence adduced at the hearing before me leads me to conclude that petitioner has more than met the test set out by the Supreme Court in *Schlup.* Indeed, in my opinion it is an understatement to say that "it is more likely than not: 'no reasonable juror' would have convicted him." 513 U.S. at 329, 115 S.Ct. at 868. I therefore conclude that petitioner has passed through the "gateway" of "actual innocence." The evidence presented by the petitioner of his innocence is, indeed, so persuasive that this court cannot have confidence in his conviction unless it is also convinced that his trial was free of non-harmless constitutional error. *Id.* at 314–16, 115 S.Ct. at 861. I therefore conclude that Richter's procedural default has been overcome and that he may present the merits of his claims. *Id.*

**IT THEREFORE HEREBY IS ORDERED** that petitioner is given ten days from the date of this order to file information, accompanied by a supporting brief, setting forth the evidence by which he wishes to expand the record or which he wishes to introduce in an evidentiary hearing, in support of the merits of his underlying constitu-

tional claims. If petitioner intends to introduce any part of that evidence by way of a hearing, he shall specify the reasons why that particular evidence may not be considered by form of a deposition or otherwise. Respondent is given ten days thereafter to respond.

May 8, 1997.

---

**15.** The only independent physical evidence of any kind is one blond head hair, half an inch in length, found on Juve's belt, which has never been matched to petitioner's. That is a slender reed upon which to rest a conviction for rape.

**16.** That statute mirrors the Federal Rules of Evidence 608(b).